## LARSON v. CROWTHER.

Circuit Court of Appeals, Eighth Circuit. May 14, 1928.

No. 7989.

**1. Patents ⊜⇒113(8), 114—Decision of Court of Appeals of District of Columbia in patent matter binds Patent Office, but does not bar equity suit by unsuccessful party (35 USCA § 63).**

Decision of Court of Appeals of the District of Columbia in patent matter is binding only on Patent Office, and does not preclude unsuccessful party from proceeding in equity in federal court, under Rev. St. § 4915 (35 USCA § 63; Comp. St. § 9460), to have determined question whether his application for patent should have been allowed.

**2. Patents ⊜⇒114—In suit under statute to obtain patent, plaintiff has burden of proof (35 USCA § 63).**

In suit under Rev. St. § 4915 (35 USCA § 63; Comp. St. § 9460), to obtain patent brought by unsuccessful applicant against one to whom patent had been granted, plaintiff has burden of proof, since presumption favors party holding patents, and suit is really one to set aside action of department of government.

**3. Patents** ⊚⇒114—In reviewing conflicting testimony in suit for patent, great weight must be given findings of trial court, who could observe witnesses.

In reviewing conflict in testimony as to originality of inventions, great weight must be given to findings of trial court, who had opportunity to observe witnesses.

**4. Patents** ⊚⇒91(3)—Evidence held to support finding that plaintiff was entitled to priority of invention (35 USCA § 63).

In suit under Rev. St. § 4915 (35 USCA § 63; Comp. St. § 9460), by unsuccessful applicant for patent against patentee to obtain patent, evidence *held* sufficient to support finding that plaintiff was entitled to priority of invention.

**5. Patents** ⊚⇒30(1)—Mere conception is not invention.

Mere conception is not invention, within patent law.

**6. Patents** ⊚⇒191—Patentee is entitled to all uses to which invention may be put, though not aware of particular use when he secures patent.

Inventor is entitled to all uses to which his invention may be put, even if not aware of such uses when he secures patent, so that it is unimportant whether applicant for patent, based on idea of destroying bacteria by subjecting them to gas, knew just what result bacteriologically his process would accomplish.

**7. Patents** ⊚⇒92—Where novelty of invention is joint production of two parties, one should not be awarded sole patent.

Where novelty of invention is in fact joint production of two parties, brought about by united efforts of both, one of parties should not be awarded sole patent.

**8. Patents** ⊚⇒114—On appeal in suit by unsuccessful applicant against patentee for patent, patentee held not in position to urge that patent should be joint one (35 USCA § 63).

On appeal in suit under Rev. St. § 4915 (35 USCA § 63; Comp. St. § 9460), brought by unsuccessful applicant for patent against patentee to obtain patent, patentee *held* not in position to urge that patent should be joint one.

**9. Patents** ⊚⇒93—General rule is that additions made by employee to preconceived design of employer are property of employer, and may be embodied in his patent.

Where party has discovered improved principle, and employs another to assist in carrying out such principle, and employee makes valuable additions to preconceived design of employer, such improvements are in general to be regarded as property of employer, and may be embodied in his patent and as part of his invention.

**10. Patents** ⊚⇒93—Suggestions of employee of University as to invention held not to inure to another employee, on theory that latter was employer.

Where invention was result of joint efforts of employees of University, who are working together on University time and were paid by University, suggestions of one *held* not to inure

to benefit of the other, on theory that latter was employer.

Appeal from the District Court of the United States for the District of Minnesota; John B. Sanborn, Judge.

Suit by David Crowther against Winford P. Larson. Judgment and decree for plaintiff, and defendant appeals. Affirmed.

A. C. Paul, of Minneapolis, Minn. (Paul, Paul & Moore, of Minneapolis, Minn., on the brief), for appellant.

Frank A. Whiteley, of Minneapolis, Minn. (John H. Ruckman, of Minneapolis, Minn., on the brief), for appellee.

Before LEWIS and KENYON, Circuit Judges, and KENNEDY, District Judge.

KENYON, Circuit Judge. Early in 1918 appellant, Larson, and appellee, Crowther, filed applications in the Patent Office for patents upon process and apparatus hereinafter described. The Crowther applications were first filed, closely followed by those of Larson. In a general way it may be said that the process of which each claimed to be the original inventor was based on the idea of the disrupting or destroying of bacteria by subjecting the same to a gas, such as carbon dioxide, which would go into solution readily at high pressure, and when the organisms were impregnated therewith to suddenly release the pressure, causing the organisms to burst and be diffused. The apparatus devices on which patents were sought were to carry out and make practical this process.

While the result sought by Larson was the obtaining of vaccine in a colloidal or fluid state, less likely to absorption by the phagocytes, and Crowther was seeking a process of sterilization, the applications of both for patents substantially embodied the same ideas of invention.

From Larson's application for process patent we quote:

"The object of this invention is to provide a process or method of treating bacteria to obtain the antigenic principle thereof for use in the preparation of vaccines, or material to be used for purposes of immunization. * * *

"I claim as my invention:

"1. A process of making vaccine or immunizing material, consisting in subjecting the bacteria, held in suspension in a fluid having the quality of entering the bacterial cell by osmosis, to gas under pressure in such fluid, and then drawing off the mixture and liberating the gas, thereby killing and dis-

rupting the bacteria and releasing the contents of the cells. * * *

"8. Immunizing material or vaccine, in a colloidal or fluid condition, consisting of bacteria disrupted by internal gas pressure."

Crowther states in his application the object of his process as follows:

"1. The process of sterilizing, which consists in subjecting material to a gas which is inert with relation to the material being treated under pressure for a period of time sufficient to cause the organisms in the material to become saturated, and then suddenly releasing the pressure, whereby the sudden expansion of the gas within the organisms will disrupt the same."

The claims of invention in the application for apparatus patents are very similar. Claims 1 and 5 of the Larson application are fair examples thereof. They are as follows:

"I claim as my invention:

"1. An apparatus of the class described, comprising a receptacle for fluid containing bacteria having means for connection with gas under pressure and soluble in said fluid, a gas expansion chamber having inlet and outlet ports and means for normally closing said inlet port, and means for conducting mingled gas and bacterial fluid to said inlet port for delivery to and release in said chamber when said closing means is opened. * * *

"5. An apparatus of the class described, comprising a receptacle for fluid containing bacteria having means for connection with gas under pressure and soluble in said fluid, and a gas expansion chamber having means for admitting mingled gas and bacterial fluid thereto, for the purpose specified."

Interferences were declared in the Patent Office. The first hearing was on the apparatus interference. The Examiner of Interferences awarded priority of invention of the subject-matter to Crowther, holding that he had actually made all the devices which led up to and culminated in the invention, and that the problem was purely a mechanical one, namely, "that of treating a liquid with a gas under high pressure, and suddenly releasing the pressure, so as not to lose the liquid." This decision of the Examiner of Interferences was appealed to the Board of Examiners in Chief, which board reversed the action of the Examiner of Interferences and awarded priority of invention to Larson. The board in its opinion stated that Crowther undoubtedly had some idea of sterilizing food by the use of gas under pressure as early as 1912, and that he may have had in mind for such purpose carbon dioxide, as well as other gases. It found that Crowther

was unworthy of belief, which opinion was based upon Crowther's testimony regarding tests upon meat or rubber in February or March, 1917, and also his testimony that a tank of carbon dioxide had been sent to his room at the Dental School of the University of Minnesota by Larson, and that he had used the same in experimental tests in developing his process. Crowther was unable to produce other testimony than his own as to this matter, and the Board of Examiners found that no such tank was furnished. They also found that the apparatus was closely tied to the original process for the carrying on of which it was originated, and that it was merely ancillary to the plan of invention; that Larson was the employer and Crowther the employee, and that therefore the invention inured to the employer.

After this decision Crowther petitioned the Commissioner of Patents to remand the apparatus interference to the Examiner of Interferences, with instructions to reopen the same on account of additional evidence. This was granted, and the apparatus and process interferences were heard together. New evidence was introduced, and the acting Examiner of Interferences in his opinion said:

"Since the Board of Examiners in Chief rendered the decision above referred to, not only has additional evidence been introduced into this case, but considerable evidence has been adduced in the companion interference, No. 44049, which is believed to give new and additional light relative to the matters in controversy. The former decision of the Board of Examiners in Chief is therefore not regarded as controlling as to findings of fact and particularly as to matters relating to the process invention. After an examination of all the evidence now in the case it is held that Crowther is entitled to prevail."

Both interferences were decided in favor of Crowther. The case involving both interferences was then appealed to the Board of Examiners in Chief. This board again reviewed the evidence in an extended opinion, and held that long prior to Larson's conception "Crowther had conceived the idea of employing a gas which, like carbon dioxide, will be taken into the liquid and from thence into the organisms contained therein in considerable quantities, under such pressure as to cause disruption of the organisms upon sudden release of the external pressure," and referred to dates on which experiments were performed by him, and also to the tank containing carbon dioxide used for experimental purposes in Crowther's room at the University, concerning which, under the new evi-

dence, they reached a different conclusion than in their former opinion in the apparatus interference. They sustained the decision of the examiner of interferences awarding priority of invention both as to apparatus and process to Crowther. Appeal was taken by Larson from this decision to the Commissioner of Patents, and the decision of the Examiner in Chief was affirmed by Acting Commissioner of Patents Fenning. In his opinion he stated:

"The issue of this interference is a process, and I am satisfied its conception lay with Crowther. Its development into practical workability was accomplished by Crowther with the technical assistance of Larson. The two men worked together on a common problem, and, as Crowther frankly admits, he had to leave to Larson the determination of the technical bacteriological result. What Larson did was as an assistant in developing the Crowther invention."

Up to this stage of the proceedings the three tribunals of the Patent Office were in accord in awarding to Crowther priority of invention, both as to process and apparatus. Appeal was taken by Larson to the Court of Appeals of the District of Columbia, and that court reversed the conclusion of the Patent Office, holding that the invention was conceived by Larson; that Crowther was his employee, and that the evidence was insufficient to overcome the presumption that the invention was that of the employer. Larson v. Crowther, 1 F.(2d) 761, 55 App. D. C. 58. The court evidently gave great weight to the fact that Larson was a trained scientist and bacteriologist, and concluded that Crowther was merely a skilled mechanic, with no knowledge of bacteria and incapable of inventing the claimed process, as appears from the following language of the opinion: "That Crowther, the skilled mechanic, with no knowledge of bacteria or of their absorption of gases, conceived, unaided and without experimentation, their destruction by suddenly releasing gas pressure imposed upon them, simply means the plucking of that conception out of the blue. That he did so we consider highly improbable, if not incredible."

[1] The decision of the Court of Appeals of the District of Columbia and judgment there entered was not final. It is interlocutory, and is "to govern the further proceedings in the case." Frasch v. Moore, 211 U. S. 1, 29 S. Ct. 6, 53 L. Ed. 65. Its adjudication is binding only on the Patent Office. It is simply a step in the statutory proceedings provided by the patent laws as an aid to the Patent Office, and the right exists in Crowther, notwithstanding that decision, to have determined on competent evidence in an equity proceeding in a federal court the question of whether his applications for patents should have been allowed. Butterworth v. United States ex rel. Hoe, 112 U. S. 50, 5 S. Ct. 25, 28 L. Ed. 656; Illingworth v. Atha (C. C.) 42 F. 141; Prindle v. Brown et al. (C. C. A.) 155 F. 531; McKnight v. Metal Volatilization Co. et al. (C. C.) 128 F. 51. This somewhat anomalous practice seems to give a party two days in court, instead of the traditional day, and prolongs litigation as to patents. While the decision of the Court of Appeals of the District of Columbia is more or less persuasive, dependent on the similarity of the records passed on, it is not res adjudicata as to any question between the parties.

The Patent Office, after the decision of the Court of Appeals of the District of Columbia, awarded on December 2, 1924, a patent, No. 1,517,845, to Larson on a process for making vaccine and products thereof, and also patent No. 1,517,844 on an apparatus for making vaccines. Crowther brought this action in the United States District Court under section 9460, Comp. Stat. 1916 (Rev. St. § 4915), which provides:

"*Patents Obtainable by Bill in Equity.* Whenever a patent on application is refused, either by the Commissioner of Patents or by the Supreme Court of the District of Columbia upon appeal from the Commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the Commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and otherwise complying with the requirements of law. In all cases; where there is no opposing party, a copy of the bill shall be served on the Commissioner; and all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not." 35 USCA § 63.

He pleaded that he was the inventor both of the process and of the apparatus; that prior to the making of his applications to the Patent Office he was persuaded and induced by Larson to exhibit, explain, and

disclose the process invention to him, and that Larson in fraud of his rights filed application for the patents. He asked a decree holding that he was entitled to receive letters patent for his inventions as specified in his claims. Larson in his answer denied that Crowther was ever persuaded or induced to exhibit, explain, and disclose to him the inventions at issue, denied that he ever appropriated any invention of Crowther, either in whole or in part, denied that Crowther did originate, invent, conceive, or suggest to defendant the principles or ideas of the inventions or discoveries set forth and claimed in his said letters patent, or either of them. An extended trial resulted, and the trial court made certain findings of fact, which, on account of their importance in the determination of this case, we here set out, viz.:

"(1) That Crowther is a mechanic of much more than ordinary ability, possessed of considerable genius and originality; that his knowledge of micro-organisms is limited to such general information as a man of his character and attainments would ordinarily have. That Dr. Larson is a bacteriologist of great ability, who has been engaged in research work and various experiments in connection with immunization, and is familiar with the nature, composition and customs of micro-organisms.

"(2) That Mr. Crowther, in the fall of 1916, when he began to work with Dr. Larson and Dr. Hartzell in the preparation of devices to subject bacteria to high direct pressure, had in mind that bacteria might be killed by subjecting them to the pressure of carbon dioxide gas and suddenly releasing that pressure. This is clearly established by the testimony of Dean Owre, Dr. Hare, Dr. Griffith, and Professor Frary. Whatever doubt may have existed on this subject prior to the introduction of the deposition of Professor Frary has now been completely eliminated.

"(3) That Mr. Crowther performed the mechanical services in connection with the construction of all of the devices. That the work of constructing them began in the fall of 1916. That up to about February of 1917 no device had been made for the purpose of applying gas pressure to bacteria and suddenly releasing it. That the devices up to that time had been those which had as their purpose the subjecting of the bacteria to high direct pressure. That about the time that the last cylinder and plunger device was made there was a sudden switch made in the experimentation from the direct pressure devices to gas pressure, and from that time forward all other devices were of the latter character.

"(4) That Mr. Crowther did have in his workroom, after he had manufactured the first gas pressure device, two carbon dioxide tanks, one empty and the other full. That there was attached to the full tank in his workroom one of the first gas pressure devices, and that some experiments were conducted by him and by Dr. Larson in that room with this device. This conclusion I think must follow from the testimony of Crowther, Irwin, Dryburgh, Dr. Griffith, William E. Crowther, and Miller.

"(5) That Exhibit C, which was the perfected device, was not manufactured until after October 15, 1917. This conclusion I think must be reached from the testimony of Crowther, which to my mind is fully corroborated by the fact that in his report to Dr. Hartzell, made October 15, 1917, he made no mention whatever of Exhibit C. There would seem to be no reasonable justification for his failing to mention that device, if it was in existence at that time. If he designed and made it, he certainly would refer to it; and, if he was trying to take credit for something designed by Dr. Larson, there would be even greater reason for his referring to it.

"(6) That a small amount of air would probably be entrapped in the lead capsule in which the bacterial suspension was placed during the last experiments with the cylinder and plunger devices. That the pressure of the Olson testing machine was applied slowly and released slowly, and there was nothing about its operation which would suggest a sudden release of pressure.

"(7) That Crowther made to Drs. Larson and Hartzell, on or about October 15, 1917, a report in which he took credit for inventing the gas pressure devices, and that they made no comment with reference to it."

The court held that Crowther was entitled to receive patents for his inventions, both of process and apparatus and entered decree to that effect. From this decree Larson prosecutes this appeal.

[2] The real question in the case is one of priority of invention—clearly a fact question. Larson having been granted the patents, the burden of proof was upon Crowther, as the presumption would be in favor of the party holding the patents; this case really being one to set aside the action of a department of the government. The rule laid down in Morgan v. Daniels, 153 U. S.

120, 125, 14 S. Ct. 772, 773 (38 L. Ed. 657), and followed ever since, is as follows:

"Upon principle and authority, therefore, it must be laid down as a rule that, where the question decided in the Patent Office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction."

Of course, the Patent Office's final decision to award the patents to Larson was because of the decision of the Court of Appeals of the District of Columbia. Nevertheless the presumption in favor of Larson stands.

While the lay mind becomes confused when it undertakes an excursion into the realms of bacteriology, the problem here when stripped of technical language is not difficult to understand. There have been marvelous developments in the production of vaccines for use in the prevention and treatment of disease—nearly all contributing to the well-being of humanity and the preservation of human and animal life. Dr. Larson and Dr. Hartzell for some time had been exploring in this field, and working on processes for the disruption of bacterial cells and the separation of toxins from the bacteria through direct application of pressure. There was nothing new in this. The idea of subjecting the bacteria to a gas such as carbon dioxide under great pressure, and, after the organisms had become saturated with the gas, to suddenly release the pressure, resulting in disrupting the organisms by the expansion of the gas, was new. The destruction of bacteria by the sudden release of pressure is the crux of the process invention involved here. Such destruction results in producing the immunizing material in colloidal or liquid form, so as to be, when injected into the blood of a patient, less subject to destruction by the phagocytes or white blood corpuscles.

Was Larson or Crowther entitled to credit for this rather brilliant and novel idea? If Crowther was a mere mechanic, as the Court of Appeals of the District of Columbia seemed to regard him, question would naturally arise as to his ability to conceive and work out any such problem. He was not a bacteriologist, and the bacteriological results of the process were not in his mind. His problem was chiefly sterilization of food products. The Court of Appeals of the District of Columbia did not have the witnesses

26 F.(2d)—50

before it, but based its decision on the printed record, and that court seems to have been impressed with the idea that there was nothing in the education, or experience of Crowther which would give him information as to the effect of gases upon bacteria, and that he could not well have evolved the methods of disrupting organisms which he claims to have conceived. This record presents a different picture of . Crowther. It shows that he had studied in technical schools in England, had been connected with mechanical manufacturing concerns, worked in the research laboratory of one of them, had been interested in making mercerizing machines for mercerizing cotton, had been employed in electrical work, had become interested in the preparation of antiseptic material for sterilizing, and had made apparatus for using hydrochlorides of lime and other chemicals for sterilizing of toilets and sewers to bring about the destruction of bacteria. He had been a student of physics, and had received prizes at a school of technology in England for success in science. When he became connected with the University of Minnesota, he did a large part of the mechanical work required by some of the professors in the construction of various and sundry devices and appliances.

Dr. Owre, Dean of the College of Dentistry of the University of Minnesota, testified that parties talked with him concerning Mr. Crowther and referred to him as a genius, and Dr. .Owre in his testimony refers to him as an inventor of genius, and emphasized his general value to the whole University. It appears, therefore, that Crowther was something more than a mere mechanic and passive agent in the hands of Dr. Larson. The evidence shows he used his own original methods, and discarded or improved upon ideas furnished by others; that he was a man of definite and fixed ideas, of much imagination, with a considerable knowledge of physics; that he had been working on the problem of the destruction of bacteria in foods and water for some time, and had made various appliances to use with reference thereto before he met Dr. Larson. That he knew little of osmotic pressure, osmotic equilibrium, or osmotic tension, when designated by their technical terms, may be conceded.

While Dr. Larson, and Dr. Hartzell, who is closely associated with him in this matter, and whom the trial court described "as more partisan than Dr. Larson himself," referred in testimony on the interference hearing to Crowther in rather disparaging language, it is interesting to note that on December 26,

1917, a short time before the applications for patents were filed, Dr. Hartzell, with Dr. Larson's knowledge and acquiescence, wrote to the president of the University of Minnesota concerning Mr. Crowther as follows:

"Dr. M. L. Burton, President University of Minnesota, Minneapolis, Minnesota—My Dear President Burton: I am writing you regarding Mr. Crowther, who has aided us very materially in the making of utensils for our research.

"We have under way a research on 'the Destruction of Bacteria without Heat.' His knowledge of applied physics is second to that of no man's in the University, as far as I know. If we were to lose him, we would have difficulty in securing a man in his place. Dr. Larson and I urgently desire to keep Mr. Crowther in the service of the University, and we hope that might be made possible. Mr. Crowther is entertaining a proposition to go into the service of the United States government in Washington, D. C., on a piece of research. If we are to keep him, it is important that something to satisfy Mr. Crowther should be done in the very near future.

"I have interrogated Mr. Crowther as to how much money he should have to remain in this service, and he said, 'four hundred dollars.' Of that sum, I am prepared to raise $100 myself and have pledged that amount to Mr. Crowther. If the regents could add $300 to Mr. Crowther's salary, we could keep him until next spring. Mr. Crowther is a man of unusual ability. He was born and brought up in England, and is capable of earning a considerable greater sum of money than he receives for his services in his present position.

"Yours sincerely, [Signed]
T. B. Hartzell."

The trial court having had an opportunity to observe Mr. Crowther upon the witness stand, said in its opinion concerning him:

"Mr. Crowther is, in my judgment, substantially the kind of a man that Dr. Hartzell stated he was in his letter to President Burton. He is possessed of mechanical genius and originality. He is intensely interested in problems of a scientific and mechanical nature. He is of a communicative disposition, disposed to tell all he knows upon any given subject which is under inquiry. He has not had the early advantages which Dr. Larson has had, and has not as yet been able to capitalize his ability. He is ambitious and thoroughly interested in himself and his work. There is nothing about his appearance or past history which would indicate that he was the sort of a man who would take credit for ideas furnished by others, nor is there anything which would lead one to suppose that he would be unable, while engaged in a joint enterprise, to separate ideas furnished by another from those furnished by himself. He shows the utmost familiarity with all of these various devices which he claims he designed and made."

Dr. Larson was a professor of bacteriology and immunology at the University of Minnesota, and was a bacteriologist of ability and wide experience. He had made many experiments looking to the destruction of bacteria by direct pressure, and the preparation of antitoxins. He had prepared articles on the subject, one of which appears in the record, which evidences great learning upon his part. A reading of the testimony of Dr. Larson convinces that he was a student and thinker, with a broad knowledge of the subjects he dealt with. The court said of him:

"Dr. Larson is a man of good appearance, who speaks well and convincingly. He is highly educated, thoroughly interested in scientific research, and has done much to bring credit upon himself and upon the University of Minnesota. There was nothing in his appearance upon the stand or the manner in which he gave his testimony which would indicate that he was falsifying, or that he was the kind of a man who would appropriate to himself the ideas of others. He did not show nearly as much familiarity with the various devices made for the joint experiments as did Crowther."

The unfortunate situation was presented in the trial court of two men, both of high standing and character, neither of whom the court finds is the sort of a man who would take credit for ideas furnished by others, testifying directly contrary as to the vital matters in the case. Referring to the testimony the court said:

"In some instances there are discrepancies between the testimony as then given by the witnesses, but most of them are of such a character as to be explained by the lapse of time, and a few of them, perhaps, are of a more serious character."

[3] The trial court was in the difficult position of passing on the veracity of these two men. Crowther testified that he imparted the idea of killing bacteria by the sudden release of pressure to Dr. Larson. Larson testified flatly that he did not, and that Crowther made no suggestions whatever to him on the subject. Crowther testified that he was induced and persuaded to communicate his ideas to Larson under a promise that his in-

vention would be protected. Larson affirms that no part of the process or apparatus originated with or was suggested by Crowther, that Crowther was a mere mechanic making such apparatus as Larson suggested, and that he (Larson) conceived the idea and disclosed and patented it in 1917. There is a square conflict in the testimony of these men as to the originality of the inventions, both of process and apparatus. These witnesses were before the trial court; it had opportunity to observe them, as we do not, and great weight must be given to its findings. This court said in United States v. Grass Creek Oil & Gas Co., 236 F. 481, 484:

"In view of the conclusions reached, we deem it unnecessary to determine the first issue, as a finding in favor of the defendants on either issue must result in the affirmance of the decree. It is a well-settled rule governing appellate courts that the findings of fact by a chancellor, although not conclusive upon appeal in equity, are presumptively correct and persuasive. Unless an error has occurred in the application of the law, or a serious mistake has been made in the application of the evidence, or the finding is clearly against the weight of the evidence, such findings will not be disturbed. And this rule is especially applicable when the evidence was heard orally by the chancellor, and he thus had the opportunity to see the witnesses, observe their demeanor while testifying, judge of their candor and intelligence, and thus be able to determine their credibility and the weight to be given to their testimony."

See, also, First National Bank of Philadelphia v. Abbott (C. C. A.) 165 F. 852; Binkley v. United States (C. C. A.) 282 F. 244; Doyle Dry Goods Co. v. Lewis (C. C. A.) 5 F.(2d) 918.

[4] Viewing the matter in the light of this well-established rule, is this court justified in saying that the findings of the trial court are clearly against the weight of the evidence, or that there has been a serious mistake in the court's conclusion as to the facts? The idea of destruction of bacteria from internal explosion had occurred to Crowther as early as 1907, just before leaving England, in talking with and observing divers at Liverpool and the effect of sudden removal of pressure upon a diver brought up from the sea—the bleeding at the mouth, nose, and ears. He conceived the idea that the same principle—i. e., sudden release of pressure—could be applied to organisms, thereby resulting in their destruction. His idea seemed to be to apply this principle to milk, foodstuffs, water, and

anything else that contained bacteria. He disclosed his idea, according to the evidence, to Dr. Hare, a teacher of medicine at the University of Minnesota, to Dr. Griffith, and to Professor Frary, who were professors in the same school, and possibly to President Vincent, of the University, and others, before he met Larson.

Professor Frary's evidence was not before the Patent Office. He testifies that Crowther explained his idea and went into the physics of the destruction of organisms by saturation of carbon dioxide as early as 1912. It is in evidence that Crowther had made at various times apparatus by which he could supply high pressure gas to a liquid containing bacteria, and other apparatus, the purpose of which was to squeeze the life out of the organisms. He made the cylinder and plunger apparatus that Larson and Hartzell experimented with rather successfully. Crowther testified that in 1906 he did research work with a view to improving methods of destroying bacteria in toilets and cesspools, and that he knew the physical characteristics of bacteria, and that his knowledge went back to lectures given when he was at school. He also had general knowledge thereof from reading and from analyzing water.

[5] Of course, as this court has pointed out in George v. Perkins, 1 F.(2d) 978, mere conception is not invention; but Crowther did more than merely conceive the idea. He worked to develop it, and Larson assisted him in such development, and while Crowther undoubtedly had little knowledge as to how vaccines were made, and Larson did possess such knowledge, and was striving to produce a vaccine in colloidal or fluid form, the fact is that the process itself of disrupting the bacteria, when successfully carried out, produced the vaccine. Larson admits in his testimony that this was a purely physical process. Crowther's idea was to use his process in sterilization.

[6] However, the vaccines were produced by practicing the process in and of itself. The process was not a mere step in making vaccines; it was the whole thing; it produced them. An inventor is entitled to all the uses to which his invention may be put, even if he is not aware of such uses when he secures his patent. Therefore we think it not of importance that Crowther might not know just what result bacteriologically his process would accomplish. In Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 435, 436, 31 S. Ct. 444, 447 (55 L. Ed. 527), the court said:

"A patentee may be baldly empirical, seeing nothing beyond his experiments and the result; yet if he has added a new and valuable article to the world's utilities he is entitled to the rank and protection of an inventor. And how can it take from his merit that he may not know all of the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention, and it is immaterial whether he can stand a successful examination as to the speculative ideas involved. * * * He must, indeed, make such disclosure and description of his invention that it may be put into practice. In this he must be clear. He must not put forth a puzzle for invention or experiment to solve but the description is sufficient if those skilled in the art can understand it. This satisfies the law, which only requires as a condition of its protection that the world be given something new and that the world be taught how to use it. It is no concern of the world whether the principle upon which the new construction acts be obvious or obscure, so that it inheres in the new construction."

See, also, Minneapolis, St. P. & S. S. M. Ry. Co. v. Barnett & Record Co., 257 F. 302, 312, where this court said, "Moreover, even if this want of perception of the benefits of his invention existed, it would not be fatal to his patent, for, when one has plainly described and claimed his improvements or combinations, and secured a patent for them, he has the right to every use to which they can be applied, and to every way in which they can be utilized to perform their function, whether or not he was aware of all these uses and methods of use when he claimed and secured his monopoly;" Westmoreland Specialty Co. et al. v. Hogan (C. C. A.) 167 F. 327; Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267; Miller v. Eagle Manufacturing Co., 151 U. S. 186, 201, 14 S. Ct. 310, 38 L. Ed. 121.

Dr. Hartzell, who was collaborating with Dr. Larson at the time of the meeting of himself, Dr. Larson, and Crowther in the fall of 1916, when discussing a cylinder and plunger device to force organisms of the size of $\frac{1}{25000}$ of an inch through a sieve in order to disrupt them, was informed by Crowther that he had given considerable thought to the killing of organisms by pressure, and Dr. Hartzell said: "We are aware of that. That is partly the reason we came over to you to help us out on this proposition." Prior to the time that Crowther imparted to Dr. Larson his idea as to the sudden release of pressure, Larson was seeking to find a better way mechanically to destroy bacteria and obtain the inner juices by pressure. After Crowther's suggestions to him, the experimentation changed, and the experiments then were along the line of working out the destruction of the bacteria by the sudden release of pressure. After this time Crowther and Larson worked together, experiments taking place in Crowther's room, and the fact that Crowther had little knowledge of the law of osmosis, as technically designated, or of bacteriology, is not proof that he did not thoroughly understand the effect of the sudden release of pressure upon organisms impregnated with carbonic acid gas. Unquestionably Larson's knowledge as a bacteriologist and his experiments worked out with Crowther were of great assistance in perfecting and developing this process. He performed the experiments which determined whether the bacteria were killed by bursting, or by acidity, a subject with which Crowther was unfamiliar. Crowther made an apparatus at Larson's suggestion to demonstrate that it was the bursting of the bacteria after applying carbon dioxide to them under pressure that killed them, and not acidity.

Exhibit 9 is the most significant evidence in the whole case, and undoubtedly had much weight in the conclusion arrived at by the trial court. This was a report upon the development of the process and apparatus made by Crowther at the request of Dr. Hartzell. It was read by Dr. Larson. It covered the entire subject and Crowther's connection with it, and set forth the method in which he had indicated the matter to Dr. Larson, and everything that was done, and in it the claim was made that Crowther was the inventor of said process. Neither Dr. Larson nor Dr. Hartzell criticized the same, objected to it, or dissented therefrom. Why they should want such report from Crowther, if Larson was the inventor of the process, is difficult to perceive. As to this the trial court said:

"Is it probable that, if the situation was as Dr. Larson describes it, he and Dr. Hartzell would permit a man, who had done nothing more than obey their orders, who had never expressed any idea with reference to the problems upon which they were working, and who had no other interest in the matter than as a mere mechanic, to make such a statement as Crowther made, without saying something about it to him? The very fact of his making it, under such circumstances, would create in the mind of any one a sus-

picion that he intended to claim something, and had claimed something, that did not belong to him, and would be an insult to the men who had done the work and brought about the result. The fact that they remained silent after receiving this report from Crowther is, to my mind, strong corroboration of his testimony and tends to discredit Dr. Larson's testimony."

The force of the failure of Dr. Larson or Dr. Hartzell to dissent from this report in any way is not lessened by Dr. Larson's explanation on the witness stand that he regarded it "as a piece of egotism on the part of Mr. Crowther, not worthy of my attention." There is direct conflict between the testimony of Dr. Larson and Crowther as to the tank of carbon dioxide taken to Crowther's room at the University, which was so strongly commented on by the Board of Examiners in their first opinion on the apparatus interference and also by the Court of Appeals of the District of Columbia. It is abundantly established by the evidence in this case that Crowther's testimony was correct as to this, and that Larson's was not. At the time of giving testimony in the apparatus interference, Crowther could not explain how he got this filled tank of carbon dioxide. The truck driver, one Miller, was then out of the country. He came back later to Minneapolis, and testified in the trial that he delivered the filled tank of carbon dioxide directly from Larson's room to Crowther's room. It also appears that experiments were conducted in Crowther's room by Larson; that the gas pressure devices were there used; that Larson furnished the bacterial material, and took it out; and the testimony given upon Larson's part that no experiments were conducted in Crowther's room and that Crowther did not receive the tank of carbon dioxide is inaccurate. It is significant that, in the article by Dr. Larson published in the Journal of Infectious Diseases, he does not explain where he got the idea of sudden release of pressure. Indeed, no satisfactory explanation appears in the record as to how Larson claims to have conceived that idea. We do not think it necessary to review in detail the mass of evidence in this case. We have carefully read and considered it, and are satisfied that the findings of the court on these questions of fact are not against the weight of the evidence, and that the finding that the real invention or discovery was Crowther's should not be disturbed.

[7, 8] It is urged that sole patents cannot be issued to Crowther, because the inventions were made jointly by Crowther and Larson. Where the novelty of the invention is in fact the joint production of two parties, brought about by the united efforts of both, one of the parties should not be awarded a sole patent. That is not only patent law, but common honesty. William R. Thropp & Sons Co. v. De Laski & Thropp Circular Woven Tire Co. (C. C. A.) 226 F. 941; Smart v. Wright (C. C. A.) 227 F. 84; McKinnon Chain Co. v. American Chain Co. (C. C. A.) 268 F. 353; Joseph Ross & Co. v. Wigder (C. C. A.) 290 F. 788.

That Crowther and Larson labored together in perfecting the process and apparatus in question cannot well be denied. Working out the proper result of the process in the making of vaccines was the object of Larson and Hartzell. Crowther, as we have before pointed out, had no knowledge of what the bacteriological results of his claimed process might be. Larson had little knowledge as to the necessary mechanical contrivances to make effective the process. That was entirely Crowther's. We should have been much better satisfied if the parties had united in applications for joint patents, for both contributed to the development of Crowther's idea of disrupting bacteria by internal explosions, due to the sudden release of pressure, and there was glory enough for all. This question of joint patent, however, has never before been raised in 10 years of litigation. The trial court does not refer to it in its opinion. Evidently it was not presented there. It is not made by the pleadings.

Crowther in his pleadings claims to have been the original inventor, and alleges that the patents granted to Larson were void, because he is the true and sole inventor of the subject-matter of said letters patent. Larson, in his answer under oath, specifically denies this, and denies that Crowther ever exhibited, explained, or disclosed to him the invention or his applications, and denies that Crowther invented or suggested to him the process or ideas of the invention or discoveries, and alleges that Crowther furnished none of the ideas used in the process embodied in the apparatus, and that he is not the discoverer or inventor of any of the processes or modes of operation disclosed in either of said patents. Dr. Larson testified under oath that Crowther never suggested to him a single idea or detail relative to the process or apparatus which Crowther constructed, and that Crowther's relation to Larson was merely that of an ordinary mechanic.

Under the pleadings and his testimony, Larson is in no position now to urge that the patent should be a joint one; it is too late. This is a suit in equity. Larson has the patents. It would be inequitable and unconscionable for a court of equity, in view of the pleadings and Larson's testimony, to dismiss Crowther's bill on the theory that any patents issued for the process or apparatus should have been joint, and thus leave Larson in possession of the patents.

[9, 10] It is urged that Crowther was a mere employee of Larson, and hence that any suggestions on his part inured to the benefit of Larson.. The rule is laid down in Agawam Co. v. Jordan, 7 Wall. (74 U. S.) 583, 603, 19 L. Ed. 177: "Persons employed, as much as employers, are entitled to their own independent inventions; but where the employer has conceived the plan of an invention, and is engaged in experiments to perfect it, no suggestions from an employee, not amounting to a new method or arrangement, which in itself is a complete invention, is sufficient to deprive the employer of the exclusive property in the perfected improvement. But where the suggestions go to make up a complete and perfect machine, embracing the substance of all that is embodied in the patent subsequently issued to the party to whom the suggestions were made, the patent is invalid, because the real invention or discovery belonged to another."

In Larkin v. Richardson, 28 App. D. C. 471 (syllabus) the court said:

"1. Where a party has discovered an improved principle in a manufacture, and employs another to assist him in carrying out that principle, and the employee makes valuable additions to the preconceived design of the employer, such improvements are, in general, to be regarded as the property of the employer, and may be embodied in his patent as part of his invention." See also Minerals Separation, Ltd., et al. v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286; Milton v. Kingsley, 7 App. D. C. 531; Gedge v. Cromwell, 19 App. D. C. 192; Gallagher v. Hastings, 21 App. D. C. 88.

It is Larson's theory that before he met Crowther he had made the discovery that the phagocytes clustered around and digested the protoplasms of bacteria contained in the ordinary vaccine. He desired to obtain the protoplasm from the bacteria in colloidal or fluid condition, so that, when injected into the blood of a patient, it would produce an immunization, and not be destroyed by the action of the phagocytes, and he had been working to secure this result by direct pressure; that he went to Crowther for the purpose of having him make a cylinder and plunger device that would squeeze the juice from the bacteria, and that Crowther worked on and completed such device; that satisfactory results were being obtained with this cylinder and plunger device; and that, while Crowther may have suggested the general idea of subjecting bacteria to gas pressure and suddenly releasing the same, this was a mere suggestion, and that the same inured to the benefit of Larson, the original discoverer. There is no question as to the law, but the difficulty in Larson's position is as to the facts. The Examiner of Interferences. suggested that Larson was an assistant to Crowther. The trial court on this point stated that Crowther was not an employee of Larson. We do not see that Crowther was any more an employee of Larson than that Larson was an employee of Crowther. Both were employees of the University. They were working together on University time, and were paid by the University. The theory that any suggestions of Crowther inured to Larson's benefit finds no basis for its support in the evidence.

There are questions of veracity as between Crowther and Larson involved in this case, and, while the trial court has determined them in favor of Crowther, we think reflections in the brief of Crowther upon Dr. Larson are not justified. Considerable feeling has evidently been engendered between the parties, and both have been somewhat overreaching in their desires. Both parties performed a splendid service. The knowledge and experience of Dr. Larson contributed much to the success of Crowther's inventions, and Dr. Larson is entitled to great credit for the part he played. One may be honestly mistaken in his testimony, and such in our judgment is the situation here as to Dr. Larson. The case is a close one, and we arrive at our conclusion because of the findings of fact of the trial court, which had before it practically all the important witnesses. The conclusion of that court was expressed as follows:

"After a full and fair consideration of all of the evidence in this case, I am forced to say that I consider the testimony which tends to support Crowther's claim of such an amount and character as to carry thorough conviction."

The judgment of the Court of Appeals of the District of Columbia is not as persuasive as it would be, were the record here-

the same as there. Much additional evidence was introduced in this case.

The judgment and decree of the trial court is affirmed.