### SHRECKHISE v. RITCHIE et al.
### Civil Action No. 183.

District Court, W. D. Virginia,
at Harrisonburg.
June 27, 1946.

C. M. Elder, of Staunton, Va., for plaintiff.

Wayt B. Timberlake, Jr., and Thomas R. Nelson, both of Staunton, Va., and Glenn W. Ruebush, of Harrisonburg, Va., for defendant W. H. Ritchie.

Ward Swank, of Harrisonburg, Va., for defendant J. T. Humes.

PAUL, District Judge.

This suit is one for infringement of a patent, No. 2,341,392, granted to the plaintiff on February 8, 1944. The patent relates to an apparatus for coating transfer fabrics. The defenses are (1) non-infringement and (2) that the plaintiff is not the sole and original inventor of the apparatus, but that it was conceived, developed and constructed by a group of persons including the defendants Humes and Ritchie, the plaintiff, and one Edward Wright, now deceased.

George W. Sandy was made an original defendant, along with Ritchie and Humes, but on motion of the plaintiff the suit was dismissed as to Sandy before trial.

### History of the Patent.

The facts disclosed by the evidence are substantially as follows: For some years prior to 1936, J. T. Humes, one of the defendants, had been engaged in the business of repairing typewriters and in selling typewriters and typewriter supplies. He had become interested in the problem of applying to typewriter ribbons a coating in the form of a chemical solution for the purpose of giving to the ribbon longer wearing qualities and adding to its efficiency in printing. In 1936 Humes arrived at what he considered the proper coating solution for the accomplishment of his purpose. At that time and for some years prior thereto Humes had been well acquainted with W. H. Ritchie, the other defendant here, whose business experience had been mainly as a salesman of various products. The two men had had considerable association in devising and selling various devices connected with the use of typewriters, Ritchie's primary activity being in the sale thereof. Ritchie knew of Humes' work on the coating solution and apparently it was understood that he was to have a half interest in any profits that might result from perfecting and patenting the solution; his part to be in promoting the sale and use of ribbons treated with the solution. Neither of these men had the financial means to obtain a patent and to promote the sale and use of the coating solution or the coated ribbons.

In this situation Ritchie approached George W. Shreckhise, the plaintiff here, who was a nephew of Ritchie, with a view to getting Shreckhise to put up the money to obtain the patent for the coating solution. Shreckhise agreed to finance the patent, under an oral agreement for an interest in the enterprise, the exact extent of which is not clear but was apparently a one-third share. A patent for the coating solution was obtained in the name of Humes. The date of the issuance of this patent does not appear and it is not material.

Prior to applying for the coating solution patent and while developing the formula finally patented Humes had devised or constructed a mechanical device for applying the solution to the ribbon. This consisted of a small tank filled with the solution and with a small aperture in the bottom of the tank, through which the solution could drip or flow out of the tank. The process involved the use of two reels mounted on opposite sides of the tank and in winding the ribbon from one reel to the other, in the course of which movement the ribbon

passed across the aperture in the bottom of the tank and was coated by the solution flowing onto it from the tank. The movement of the ribbon was effected by a turning by hand of a handle or crank on the second reel.

After the perfection of the coating solution, the parties appear to have made some effort to interest manufacturers of typewriter ribbons in using the coating solution on a royalty basis. Little, if any, headway was made at this, however, and sometime in 1938 the parties turned their interest to the problem of coating and marketing the ribbons themselves. It was apparent to them all that the device used by Humes in the course of his development of the coating solution was inadequate and unsatisfactory for preparing the ribbons on any large scale. The process was too slow and the downward flow of the solution onto the ribbon frequently resulted in excessive and irregular coating. It was agreed that a speedier and more efficient method was needed.

Accordingly in the fall of 1938 they began working on a more efficient device. The scene of these experiments and trials was in Humes' place of business in Harrisonburg and they were participated in by Humes, Ritchie and Shreckhise; and seem also to have been aided from time to time by friends of these three who dropped in to observe and offer suggestions. Among these was one Edward Wright, now deceased, a man of some mechanical turn of mind who appears to have been paid by Shreckhise for his advice and services. The testimony is not clear as to the various steps taken in developing the machine finally patented and in controversy here and, in fact, is largely silent except as to one or two elements of the perfected device. Apparently it was agreed from the outset that, instead of having the solution flow by gravity from the bottom of the tank onto the ribbon to be coated, it was desirable to have the ribbon pass above the tank and to apply the solution by forcing it through a pipe or similar conduit to a point above the tank where it could be sprayed upon or otherwise applied to the ribbon as the latter moved along and where

any excess of the solution would drip back into the tank. This naturally required a pump or some form of power to force the solution through the pipe to the point of application. So far as the evidence shows these general principles for the operation of the device were agreed on or understood by all the parties and no one claims individual credit for them. It is from this point on that the controversy starts.

The problem in the successful operation of the machine was to insure that the coating solution would be applied to the ribbons in the proper quantity and uniformly throughout the length of the ribbon. In the early trials, at least as the Court understands from the evidence, the method used to force the solution through the pipe was some form of pump having intermittent impulses, with the result that these intermittent applications of pressure to the solution caused a lack of uniformity in its application to various parts of the ribbon. As part of this same problem of coating the ribbon uniformly and to the right degree, was the question of how the solution should come into contact with the ribbon and how to prevent any excessive amount of the solution from remaining on the ribbon.

As finally worked out, the means adopted to force the solution from the tank to the point where it was applied to the ribbon was a spiral or "worm," as it is usually called, which applied a constant and unvarying pressure. At the point where the coating solution was applied it emerged from the pipe through what is termed a nozzle from which it was sprayed upon the ribbon as the latter moved by the opening in the nozzle. At about the point where the ribbon received the coating solution there was mounted a roller or cylindrical rod under which the ribbon passed and the purpose of which was, apparently, to keep the ribbon under proper tension and to hold it close to the point where the solution emerged from the nozzle. On the other side of this roller was mounted a blade over and against the edge of which the ribbon passed after being coated and the function of which was to scrape from the ribbon any excess of the coating material

and allow it to drip back into the tank. The controversy here involves the conception and perfection of certain of the elements above mentioned as will be hereinafter discussed.

After the machine, operating as above described, had been perfected to the satisfaction of the parties, which seems to have been late in 1938 or early in 1939, they decided that other quarters were necessary for utilizing it in the commercial production of the coated ribbons. Accordingly at the suggestion of Shreckhise a building was rented in the town of Weyer's Cave, Va., which was the home of Shreckhise and the machine was installed there to embark upon production of the coated ribbons. Up to this time the parties had no written agreement among themselves and seem to have had only a rather indefinite understanding that Humes, Ritchie and Shreckhise were to share equally in any profitable results of the enterprise.

From the time that the machine was installed at Weyer's Cave, however, Shreckhise seems to have taken charge and proceeded to ignore the rights and interests of the other parties. He had rented in his own name alone the building where the business was set up in Weyer's Cave and in other respects also assumed an attitude of proprietorship. Humes apparently became dissatisfied with this situation and in April, 1939, caused to be drafted a paper setting forth the joint interest of the parties in the coating machine. The others, however, refused to sign this and Humes thereafter returned to his own shop in Harrisonburg and to his work there. Shreckhise and Ritchie continued operations at Weyer's Cave under some sort of partnership into which Shreckhise seems to have introduced his two brothers and which traded under the name of Shrec-Rich Ribbon Co. In April, 1940, Shreckhise applied for a patent on the machine in use at Weyer's Cave and which was the same which has been described and which was developed in Humes' shop before removal to Weyer's Cave. This application was made in his name alone and in it he claimed to be the sole inventor. A patent finally issued in the name of Shreckhise in February, 1944. Humes knew nothing of this application being made. Ritchie knew of it but is not clear whether he knew that the application was in the name of Shreckhise alone.

Sometime in 1944 Ritchie and Shreckhise fell into disagreement and the former instituted a suit in the state court for the dissolution of the Shrec-Rich partnership. In the meanwhile Humes, after severing his connection with the Weyer's Cave operations, or being ousted therefrom, built or had fabricated another machine for coating ribbons which operated on the same general principles but contained some modifications and supposed improvements over the one first developed and on which Shreckhise had procured the patent. After the falling out between Ritchie and Shreckhise the former returned to Harrisonburg and arranged with Humes to use the latter's new machine to produce some ribbons to fill certain orders which he had. This production appears to have been over a period of several months during the summer of 1945 and constitutes the alleged infringement of the patent held by Shreckhise.

### Discussion of the Facts.

As previously stated, the defendants contend that the patent held by Shreckhise is invalid for the reason that Shreckhise was not the sole inventor, and further contend that the later machine made by Humes does not infringe the one on which Shreckhise procured the patent. These defenses may be taken up briefly in order.

The testimony in this case as between Shreckhise and the other witnesses is distinctly contradictory. Having asserted himself to be the inventor of the machine on which he obtained the patent, Shreckhise, in his testimony, takes credit for each step in its development which contributed to its effective operation. Just what these steps were is not entirely clear, but whatever they were he claims credit for them all. There is no need to recount all the testimony in the case and it would be tiresome to do so, but it is sufficient to say that it clearly disproves any claim of Shreckhise to be the sole inventor.

The basic idea of coating a typewriter ribbon was that of Humes, as was also the idea of applying the coating by having a tank or container filled with the coating solution with an aperture in the tank through which the solution could be expelled onto a moving ribbon which was thereby coated throughout its length. The device which Humes had used in his efforts to develop the proper formula for the coating solution had embodied all these features. The idea of forcing the coating solution through a pipe and applying it to the ribbon at a point above the tank was accepted by all the parties and no one, not even Shreckhise, claims to have conceived this. It would appear from the evidence that the problems the solutions of which were not at once apparent and which required some thought and experiment were (1) to obtain a steady flow of the coating solution to the point of its emergence onto the ribbon, (2) bringing the ribbon under satisfactory tension into the proper proximity to the point where the solution emerged onto it, (3) whether the coating should be applied to the ribbon through a nozzle or by some other means.

Taking the evidence as a whole I am of opinion that it clearly disproves the assertion of Shreckhise that he alone conceived the solution of these difficulties, or of any essential element of the completed machine. It is clear that all of the parties were working together trying to perfect the device. As any obstacle or imperfection arose they discussed it among themselves and made suggestions for its correction. From the testimony it is difficult to attribute to any individual the credit for the final result. The very fact that they were all working together in an informal way, pursuing a common purpose and discussing and suggesting among themselves the means of accomplishing it, is no doubt the reason why the witnesses, with the exception of Shreckhise, are somewhat indefinite as to the part which each played. However, it does appear from the evidence that Edward Wright suggested the use of the spiral or worm as the means of obtaining the pressure on the coating solution, and that the use of the cylindrical

rod to hold the ribbon while being coated first occurred to Ritchie. Who proposed the use of a nozzle to spray the coating onto the ribbon does not appear. Seemingly it was accepted by all of them as an obvious means, which it undoubtedly was. As to the blade or scraper for removing the excess solution from the ribbon and for which Shreckhise also claims credit, there was no novelty or invention involved in the use of this. The original hand-operated machine which Humes had used while developing the coating solution contained a device for this purpose. The scraper on the completed machine was merely an adoption of the same thing in somewhat different form.

No doubt Shreckhise had an active part in developing this ribbon coating machine to the point of its practical commercial use; but it was not the part of an inventor. He probably had less to do with any inventive activity or in bringing about the mechanical perfection of the machine than any of the others. He was not a man of mechanical training or experience as were both Humes and Wright. His occupations had been that of a farmer and a manufacturer of chicken coops. His interest in the enterprise arose from the fact that he had expended some money in obtaining the patent on the coating solution and otherwise and he naturally desired to recoup this as well as to be a beneficiary in a possibly profitable enterprise. He undoubtedly took an interest in and was active in the common effort. His eagerness to achieve practical results probably served to spur the efforts of his companions. It was he who, with the knowledge and acquiescence of his partners, took the crude models to the machine shop to be worked into shape, and it was he who, on completion of the machine, suggested and made the arrangements for establishing the site of operations at Weyer's Cave. But there is no evidence, except his own statement to that effect, that he is the inventor of this machine or any essential part of it. The evidence is distinctly to the contrary. In an effort to picture himself as a man possessing mechanical knowledge and experience and to furnish a background for

his claim of invention, Shreckhise resorts to frequent use of the phraseology of mechanics and of the patent office, and claimed to have made various other inventions. This former he seems to have picked up while applying for the patent and the latter turned out to have no foundation in fact.

In order to place this controversy in the proper perspective it is necessary to consider and appraise the characteristics and temperaments of the several parties as these appeared from the evidence and from the attitude and demeanor of the parties as witnesses. It appears that Humes is a man who is not well educated, has little business sense or initiative, is not aggressive in the protection of his own rights and tends to defer to the decisions of any more dominant personality. Ritchie's experience is that of a salesman and in this transaction his primary concern seems to have been that there should be produced something which he could go out and sell. His close relationship to Shreckhise was no doubt a factor in his seeming willingness to let the latter assume charge of everything. And the fact that both Humes and Ritchie were without means and were dependent on Shreckhise to finance the enterprise was undoubtedly a cause of their submissive attitude. This necessary deference to a financial angel is not uncommon. Shreckhise was a man who had made some money and who seemingly holds this as a primary aim in his life. He also indulges the unfortunate but frequently encountered philosophy that one who has contributed money to the furtherance of any transaction is entitled to run the show regardless of what contribution may have been made by others. He is aggressive and of more dominating personality than either of the other parties and with a more alert business sense; and apparently is none too scrupulous in his standards of fair play and of truthfulness, if one may judge by his course in this transaction and by his testimony, much of which the court found itself unable to believe.

The truth of this whole matter, as the court believes is clearly apparent from the evidence, is: That, beginning with Humes original machine, the parties set out to develop it into one of more practical use. That to this effort they all contributed to some extent by suggestions and experiments; that Shreckhise participated in this effort but did not himself conceive any of the elements that resulted in bringing the machine to final workability. That when the machine was completed Shreckhise caused it to be established at Weyer's Cave for commercial operation and assumed the position of proprietor of the business. That, because of the importance which Shreckhise attached to his financing of the enterprise he probably believed that he was responsible for the perfection of the machine and entitled to handle it as he pleased. That this attitude was encouraged when, after ignoring Humes' request for the execution of the partnership agreement, he found that Humes made no protest and abandoned any pursuit of his rights. That when it became apparent that a profitable business could be founded on this ribbon-coating process, Shreckhise decided to patent the machine; and that, accordingly, he applied for and did obtain a patent on the representation that he was the sole inventor thereof.

It is plain that the plaintiff was not the inventor, certainly not the sole inventor, and to hold that this patent is valid and to grant the plaintiff the remedies which he seeks against the defendants by virtue of it would, in the opinion of the Court, amount to using the power of the court to protect him in the fruits of a piracy.

It is well settled that (aside from questions of assignability) patents can be granted only to the true inventors of the invention and must be issued in the name of all of the inventors; that a patent issued in the name of joint patentees, when in fact one of them is the sole inventor, is void; and similarly when a patent is issued to one person for something which was jointly invented by several the patent is invalid. Walker on Patents, 6th Ed., Sect. 89; 40 Am.Jur. 576; Arnold v. Bishop, Fed.Cas.No. 552 and Id., Fed.Cas.No. 553; Atlantic Works v. Brady, 107 U.S. 192,

2 S.Ct. 225, 27 L.Ed. 438; American Electrical, etc. Co. v. Newgold, C.C., 108 F. 957, 959; Thomas v. Weeks, Fed.Cas.No. 13,914; Welsbach Light Co. v. Cosmopolitan, etc., Co., C.C., 100 F. 648; Ross & Co. v. Wigder, 3 Cir., 290 F. 788; McKinnon Chain Co. v. American Chain Co., 3 Cir., 268 F. 353; Larson v. Crowther, 8 Cir., 26 F.2d 780, 789.

The validity of a patent may always be attacked on the ground that the invention was made by another, or others, jointly with the sole applicant. Walker on Patents, 6th Ed., Sect. 490. And the authorities have not been silent on what constitutes joint invention. In Altoona Publix Theatres v. American Tri-Ergon Corporation, 3 Cir., 72 F.2d 53, 56, the court says:

"The authorities are unanimous in holding that joint inventions are made when two or more persons jointly work or collaborate in devising and putting into practical form the subject matter of the patent in question."

Continuing the Court quotes from Robinson on Patents:

"It is not necessary that the same idea should occur simultaneously to each. On the contrary, it is immaterial who first conceives any particular theory or plan of the invention or in what order the development of its subordinate ideas proceeds. Where two or more inventors have agreed that a result, if it could be achieved, would be desirable, neither as yet having attempted to provide a means, and from this point go forward by mutual consultations and suggestions to devise one, the means devised becomes a joint invention."

And in McKinnon Chain Co. v. American Chain Co., 3 Cir., 268 F. 353, 360, the court states that where two men had at one time "worked together for a common end, which was finally accomplished by the contributions and united efforts of both, we are of opinion, after applying familiar law to the facts, that the invention was the invention of both, and was, therefore, joint invention." Citing cases.

Even if it were to be conceded that in the development of this machine Shreck-

hise had contributed as greatly as any of the others from an inventive standpoint (which I do not think was the case), it would still be a joint invention.

Applying the above stated principles to the facts shown in this case, it is clear that the patent (No. 2,341,492) issued the plaintiff is invalid. It is true that the issuance of a patent carries a prima facie presumption of its validity. But the force of this presumption is weakened when the ground upon which validity is assailed was not in issue before the patent office and never known or considered there. In the instant case the patent issued to Shreckhise on his representation that he was the sole inventor. Had the true facts been disclosed at the patent office I have no doubt the application would have been rejected. But in any event the evidence clearly establishes that Shreckhise was not the sole inventor, that his patent is invalid and that his complaint should be dismissed.

The part played by Ritchie from the time this apparatus was removed to Weyer's Cave until he broke with Shreckhise in 1944 is somewhat peculiar. It appears that he refused to sign the paper prepared by Humes setting forth the joint interest of the parties in the invention. In doing this and in conducting the operations at Weyer's Cave in partnership with Shreckhise and the latter's brothers, Ritchie appears to have acquiesced in the effort to exclude his friend Humes from the rewards of the enterprise. It further appears that Ritchie knew of Shreckhise's application for the patent and probably knew that it was in the name of Shreckhise alone. He also, in 1942, as a partner in the Shrec-Rich Ribbon Co., signed a contract with the Codo Manufacturing Corporation in which Shreckhise is represented as the inventor of this process for coating ribbons. This course of conduct is difficult to understand in the face of the evidence before the court, including Ritchie's own testimony, as to the joint participation of the parties, including Humes, in this invention, and as to the share each was to have in it.

However, no matter if Ritchie acquiesced in shoving Humes out and in the effort of

Shreckhise to obtain a patent in his own name and no matter how greatly this conduct may be subject to criticism, it could not serve to make valid in Shreckhise's hands a patent which was void from the beginning.

### The Question of Infringement.

Although the court is of opinion, and so holds, that the patent sued on is invalid, it is probably desirable to express briefly its views on the question of infringement. The machine which is alleged to infringe is that which had been constructed by Humes at some time after he was ousted from the original enterprise and which he permitted Ritchie to use for several months during 1945 after the latter had fallen out with Shreckhise. This machine operates on the same general principles as the one on which Shreckhise obtained a patent, with the exception of the manner in which the ribbon is brought into contact with the coating solution. But it might also be said that both of these machines operated on the same general principles as the original hand-operated machine made and used by Humes in his experiments with the solution formula, except for certain changes and improvements. In the patented machine (the Weyer's Cave machine) the essential changes consisted of (1) forcing the solution to a point above the tank for application at that point, instead of allowing it to feed by gravity onto the ribbon, (2) to apply the solution through a nozzle, (3) to pass the ribbon under a cylindrical rod near the point where the solution was applied in order to hold it in tension and close to the end of the nozzle. In the Humes alleged infringing machine element (1) above is utilized in that the solution is forced to the top of a pipe and the ribbon is coated by being drawn across the surface of the solution at the top of the pipe. The other elements mentioned are not utilized in the alleged infringing machine.

It is very difficult to tell just what features of the patented machine are claimed by the plaintiff to involve invention on his part. One difficulty arises from the fact that in one of the claims in the patent (Claim 1) he claims the machine in its entirety—not even limiting himself to those features developed after he first became associated with the enterprise. While we are not here required to pass on particular claims set out in the patent, it is clear I think that claim 1 could not be supported. The other claims (Nos. 15 and 17) of which infringement is alleged are rather vague but appear to be based largely on the nozzle method of applying the solution. It was this, no doubt, which caused the plaintiff to emphasize in his testimony that the use of the nozzle was his invention and to insist that the method used by Humes in applying the solution was the equivalent of a nozzle. Proof of these two contentions was necessary to establish infringement of claims 15 and 17. While the court is of opinion that the plaintiff did not (at least alone) conceive the nozzle, it is further of opinion that even if he did, the Humes method is not the equivalent of the nozzle, that it differs both in principle and in method, and is not an infringement on that feature of the patented machine.

### Findings of Fact.

1. That this is a suit arising under the patent laws and that this Court has jurisdiction to hear and determine the suit.

2. That the patent in suit, being patent No. 2,341,392, for an apparatus for coating transfer fabrics, was issued on February 8, 1944, to the plaintiff, George W. Shreckhise, as sole inventor on an application filed by him on April 10, 1940.

3. That the apparatus upon which said patent No. 2,341,392 was granted had been constructed or assembled during the year 1938 at the shop or place of business of J. T. Humes in the city of Harrisonburg, Va., and was thereafter in the Spring of the year 1939 removed to the town of Weyer's Cave, Va., for the purpose of placing it in commercial operation.

4. That George W. Shreckhise was not the sole inventor of said apparatus but that it was the joint invention of J. T. Humes, W. H. Ritchie, George W. Shreckhise and Edward Wright; and that it and all essen-

tial features of it were conceived, developed and assembled at the shop of J. T. Humes in Harrisonburg, Va., jointly by the persons above named, before its removal to Weyer's Cave, Va.

5. That from the Spring of the year 1939 until sometime in 1944 the said apparatus was operated at Weyer's Cave in successful commercial use in the coating of typewriter ribbons by George W. Shreckhise, W. H. Ritchie and others.

6. That in April, 1940, George W. Shreckhise applied for a patent upon the apparatus hereinbefore described in which application he represented himself as the sole inventor thereof, and that the making of said application and of the representations contained therein were unknown to J. T. Humes.

7. That J. T. Humes has not shared in the income derived from the operation of said apparatus at Weyer's Cave and no accounting was ever furnished him of said operations.

8. That in the summer of 1945 J. T. Humes operated along with W. H. Ritchie, or permitted said Ritchie to operate, at Harrisonburg, an apparatus for the coating of typewriter ribbons, which apparatus had been constructed by said Humes subsequent to the year 1939 and which performed the same functions as the apparatus upon which the patent No. 2,341,392 was granted to Shreckhise.

### Conclusions of Law.

1. The patent No. 2,341,392 granted to George W. Shreckhise under date of February 8, 1944, is invalid for the reason that George W. Shreckhise was not the sole inventor of the apparatus covered by said patent.

2. The apparatus operated during 1945 at Harrisonburg by J. T. Humes and W. H. Ritchie, or by said Ritchie with the permission of Humes, is not shown to have infringed upon the patent No. 2,341,392 granted to George W. Shreckhise.

3. The remedies prayed for in the complaint should be denied and the complaint dismissed.