### McMANUS v. SAWYER et al.

#### (District Court, S. D. New York. November 30, 1915.)

1. ACCOUNT STATED ☞6(2)—IMPLIED ASSENT.

Where monthly accounts rendered by a factor prior to the principal's death were retained without objection, but those rendered thereafter were returned by the executor, there was an account stated as to all transactions included within the retained accounts.

[Ed. Note.—For other cases, see Account Stated, Cent. Dig. §§ 31–34, 36–38; Dec. Dig. ☞6(2).]

2. ACCOUNT ☞17(4)—EQUITABLE RELIEF—PLEA.

The only plea to a bill for an account, where the relation of the parties created the obligation to account, is a stated or settled account; the plea of "fully accounted" being bad.

[Ed. Note.—For other cases, see Account, Cent. Dig. §§ 85–87; Dec. Dig. ☞17(4).]

3. ACCOUNT ☞20(1)—EQUITABLE RELIEF—REFERENCE TO MASTER.

Where defendant in a suit for an accounting annexed to his sworn answer accounts rendered by him, the court can take and settle the account itself without reference to a master.

[Ed. Note.—For other cases, see Account, Cent. Dig. §§ 109–118; Dec. Dig. ☞20(1).]

4. ACCOUNT ☞17(4)—EQUITABLE RELIEF—BURDEN OF PROOF.

On exceptions to an account attached by defendant to his answer, the burden is on the plaintiff as to the items of surcharge, and on the defendant as to the items of falsification.

[Ed. Note.—For other cases, see Account, Cent. Dig. §§ 85–87; Dec. Dig. ☞17(4).]

5. ACCOUNT ☞18—EVIDENCE—EXCEPTIONS.

In a suit against a factor for an accounting, evidence *held* not to sustain exceptions of surcharge and falsification to the account.

[Ed. Note.—For other cases, see Account, Cent. Dig. §§ 89–93; Dec. Dig. ☞18.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. FACTORS ⬤⟼24—LIABILITIES—DELAY IN SALE.**

A factor is not liable to his principal for damages resulting from a delay in the sale of returned goods, which he had authority to sell only to protect his lien and was not directed by the principal to sell.

[Ed. Note.—For other cases, see Factors, Cent. Dig. § 25; Dec. Dig. ⬤⟼24.]

**7. FACTORS ⬤⟼32—ACCOUNTING—PAYMENT FOR GOODS.**

Where factors, in adjusting a fire loss, allowed the insurance company the discount given for payment within 60 days, the crediting of the principal's account with the full amount of the insurance received was equivalent to payment to the principal, whether the insurance companies had paid within that time or not.

[Ed. Note.—For other cases, see Factors, Cent. Dig. § 37; Dec. Dig. ⬤⟼32.]

**8. FACTORS ⬤⟼32—ACCOUNTING—INTEREST—COMPOUND INTEREST.**

Where it was the established course of business between a factor and his principal to charge interest on the account of each to the end of the month and then strike a balance, which would be carried forward to the next month, the fact that thereby the factor charged compound interest does not establish the falsification of his accounts, since such interest is not illegal and may be agreed on between the parties.

[Ed. Note.—For other cases, see Factors, Cent. Dig. § 37; Dec. Dig. ⬤⟼32.]

**9. ACCOUNT ⬤⟼22—EQUITABLE RELIEF—CROSS-BILL—NECESSITY.**

In a suit for accounting, a decree may be rendered in favor of the defendant for the amount shown to be due him without his having filed a cross-bill, since one who demands an accounting submits himself to the result thereof if it goes against him.

[Ed. Note.—For other cases, see Account, Cent. Dig. §§ 133–135; Dec. Dig. ⬤⟼22.]

In Equity. Suit for accounting by Terence McManus, as executor of the last will and testament of Arabella McManus, against Decatur M. Sawyer and another, copartners doing business as Sawyer & Blake. On exceptions to the account filed with the answer. Decree for defendants.

George B. Hayes, of New York City, for plaintiff.

Clinton H. Blake, Jr., and Leonard G. McAneny, both of New York City, for defendants.

LEARNED HAND, District Judge. The bill is for an accounting to be rendered by a factor to his principal under a contract of March 31, 1908. Concededly an accounting was due from the defendants, who were the plaintiff's intestate's factors. The defendants answer that they in fact accounted monthly, and that up to the time of the death of plaintiff's intestate the accounts were settled, but that after her death the accounts were returned. To the answer were annexed all the accounts actually rendered from April 1, 1910, to the conclusion of the transactions between the parties.

[1-3] Upon the trial it appeared that the plaintiff, who was the plaintiff's intestate's general agent, had returned all the accounts rendered after April 1, 1910, and that therefore there was no account stated after that time. Before then, however, the accounts had been

retained without complaint and constituted accounts stated. Moreover, the plaintiff did not seek to challenge any of the accounts rendered before that time. In equity the only plea in such case as this to a bill for an account, when the relation between the parties created the obligation to account, was a stated or settled account. Daniell, Ch. vol. 1, p. 666 et seq. The plea of "fully accounted" was bad. Bailey v. Westcott, 6 Phil. 525. Therefore this cause at common law would have gone to a master upon so much of the account as was rendered after April 1, 1910, as soon as it appeared that there had been no stated account between the parties. However, it was always possible, and not an error, for the court to take and state the account itself; and as the defendants have annexed to their answer full accounts under oath from April 1, 1910, onwards, it has been possible to treat the case in that form.

[4] The plaintiff, it is true, has assumed that the burden was upon him, though he disproved the allegation of the answer that the account was stated, to go further and show that there were enough errors in it either to require a new account altogether or to open it for surcharge and falsification. In that he was in error, but his rights may be none the less preserved by taking the account as now rendered in the answer and giving him the same rights that he would have before a master. Those rights would be to surcharge and falsify the account when rendered, which he would be obliged to do by excepting to its several items. As to items of surcharge he would have the burden; as to items of falsification the defendants would have the burden. In this latter respect the plaintiff's rights differ from what they would have been had an account been once stated, but the cause may nevertheless proceed, though a little informally, as the plaintiff has never formally excepted. Upon the trial, nevertheless, he did in fact object to a number of items, and these objections will be taken as though he had formally excepted before a master.

As to items of surcharge, some suggestion was made at the trial that there were some 3,000 yards of goods which ought to have appeared upon the accounts; but this entirely broke down in proof and was abandoned.

Another exception may also have been made that better prices should have been got for the goods taken over by the underwriters after the fire of April 20, 1910; but this was without foundation, and it, too, is abandoned, if ever made.

[5] The first serious exception of surcharge arises from the supposed failure of the defendants to charge themselves with the sale of certain of the returned goods; e. g., those contained on Schedule B of the answer. The plaintiff agrees that, when returned, the defendants had the right to credit themselves with the price at which they were originally sold, that having been once charged against them; but he insists that no charge appears upon their eventual disposition. The defendants reply that as to some of these goods their sale appears in the sales book, and that the proceeds are credited to the plaintiff in the later "accounts current." For those which did not so appear, the defendants say they have accounted in the "Fire Sales State-

ment," so called. This is a long statement delivered to the plaintiff and made up out of a larger statement of all goods injured by the fire of April 20th, under the following circumstances: The goods burned were in the third loft of the warehouse, and consisted not only of the plaintiff's but of others' goods. All these were insured by the defendants under general covering policies, and after the fire the defendant Blake took up the adjustment of the loss with the underwriters. I find as a fact that the plaintiff's assistant, Tate, was present when the goods were viewed by the adjusters, and undertook to identify which of the injured goods belonged to the plaintiff. In cases where the tags were not burnt, this could be done absolutely; in other cases, it was inevitably a doubtful conclusion. Tate gave to Blake the pages of the defendants' books upon which the prices of the goods could be found, and after Blake had agreed with the underwriters as to the price at which they would take the goods he had a general statement made and they settled with him on those figures. The "Fire Sales Statement," so called, is a compilation from so much of this general statement as concerns the plaintiff's goods. The prices were those found in the defendants' books, less certain discounts to be considered later.

The plaintiff's surcharge relates to these items of returned goods which first appear upon "accounts current" after the date of the fire; e. g., Schedule B, already mentioned. He urges that these certainly could not have been injured in the fire, and that the defendants' effort to include them in the credit allowed him in the "Fire Sales Statement" must obviously fail. Thus he depends upon the discrepancy of dates in the documents. The defendants answer that, when returned goods of the plaintiff came to their warehouse, they were entered in a receiving book by a boy, but were not opened at that time. They were sent directly upstairs, and afterwards either the plaintiff, or Tate, his agent, having counted the goods, made a list of them and brought it down to the shipping clerk, who entered them in the return book, from which they were posted into the credit book, and from there into the stock book. Now the return book, the credit book, and the receiving book have all been destroyed. I do not understand that the plaintiff suggests that there was anything sinister or improper in their destruction; I see no reason, in any event, if such a contention had been suggested, for supposing that the destruction was to suppress the books. As far as appears, certainly with the exception of the credit book, they were books of casual entry, the contents of which were posted into more permanent books in the course of bookkeeping. The only date which appeared, according to this custom of business, would be in the return book, and that date would be the date at which McManus or Tate informed the defendants that the goods had been returned. Andrews says that there was no date given by Tate and McManus of the return, and we do not know what the date of the return actually was. It is possible that McManus' own books, if they were available, might show us that, or they might not; but they are not available. In any case, the explanation given, which I accept as true, satisfies me that the goods carried in the accounts as returned after the fire might have been received before that time, and might

have been identified among those goods afterwards salved and included in the "Fire Sales Statement."

Furthermore, this appears to be certainly proved in some instances by the documents themselves, for the following reasons: On the "Fire Sales Statement" appear the case number and the yardage of some pieces which are located among the merchandise returned after May 1st. Now it is of course impossible that that piece should have been in the Fire Sales Statement, if it was not in the building at the time. The "Fire Sales Statement" was made up by going over each piece particularly, and, as has been said, the case and number and yardage of those pieces was put down, wherever the tag had not been burned off. When the same piece is identified in a subsequent "account current," it shows beyond question that at least in that instance the date of the return taken from the defendants' stock book was not the actual date of the return of the goods. This demonstration is not complete as to all the items challenged, but it serves as the strongest possible demonstration of the truth of the defendants' story as to how the apparent conflict in dates occurred. There is another consideration of no small weight, which further corroborates that story. If the returned goods in question were actually not in the fire, and were not accounted for in the "Fire Sales Statement," the books of the defendants could not possibly have balanced. Either they would have been credited to some other account, or they would have been altogether suppressed, which would amount practically to a larceny of the goods, and which the plaintiff expressly disclaims. That the goods could have been received after the fire, and have got into some other account, and never have been discovered subsequently, is of course a possibility in the sense that anything is a possibility; but it is an extreme improbability.

Therefore it seems to me from all these reasons that there can be no reasonable doubt that these items of returned merchandise, which are said to appear in the "Fire Sales Statement," actually did appear. I am quite aware of the fact that there is no indubitable tracing of some of these goods. Many of the goods in the "Fire Sales Statement" had their tags burned off. There was nothing left by which to identify them, but their yardage (which in many cases was estimated) and the pattern number of the goods, with their shade number or color. In placing some of this returned merchandise in the "Fire Sales Statement," therefore, it must be conceded that there is a certain measure of doubt. In some cases those pieces which Andrews picks out as accounted for in the "Fire Sales Statement" do not actually tally with the yardage shown upon the stock book for that piece. This may possibly be accounted for through loss by the cutting off of samples. In some cases a number of other pieces in the "Fire Sales Statement" than those selected by Andrews to answer the items in the stock book would answer equally well. It is impossible to know that he has selected the right pieces upon the "Fire Sales Statement." However, the "Fire Sales Statement" contains pieces which could respond to such of the returned goods as did not appear later to his credit in the sales book. If these returned goods are not in the "Fire Sales Statement," the defendants failed to put them in their account, and have

embezzled them, which I do not believe. I therefore find that the plaintiff has not shown that the goods so returned were not disposed of, either by insurance adjustment or by subsequent sale.

The next exception of surcharge is to the items of the 20 pieces which were in the fourth loft, and which suffered a smoke damage, for which the plaintiff was allowed $180.97, 30 per cent. of their value. These pieces have been traced into the sales book, and their disposition shown in each case. The plaintiff was credited with the sum which had been obtained from these, together with the allowance for depreciation, and no question can be raised about them.

The next exception of surcharge consists of two items of returned merchandise on Schedule G, bearing the name "A. D. Juillard & Co." and "Amoskeag Mfg. Co." The plaintiff claims that these should be charges, not credits, to the defendants, if they represent goods returned to the manufacturers who originally delivered the goods. This is explained as follows: Each manufacturer's account had a number on the defendants' stock book, and usually when goods were returned the "account current" identified them by reference to that number. On Schedule G only, for some quite unexplained reason, the name of the manufacturer was added to the account number. The explanation is adequate that it was only a redundancy in the account, and the goods are traced and later accounted for.

[6] The next exception of surcharge arises from the fact that the returned goods not accounted for in the fire were held for two years in some cases, and were then sold at greatly diminished value. This attempt at surcharge involves a misconception of the relation of factor and principal. The sale of the goods rested with McManus, the principal; they were his goods, and he was responsible for their value. Any rights of sale which the factor had were for the protection of his lien, and he was not an agent of the principal to sell. Hence, while he had the power to sell to protect himself, he had no obligation to sell to protect the principal. If he chose to leave the returned goods unsold for two years, the loss was on his own head. The factors might have sold, if they had thought it necessary, but are not chargeable with failure to do so.

[7] The next exception of surcharge is of the allowances of 2 per cent. and 10 per cent., amounting in all to 11.8 per cent., made to the underwriters when they took over the damaged goods. These allowances were from the prices at which the goods were carried upon the defendants' books. When Blake settled with the underwriters, he took as a basis the figures at which McManus carried the goods, and which he used in his sales to customers. These prices were, of course, not those at which he had purchased, and the underwriters insisted upon some deduction. McManus' usual terms were 7 per cent. off if the payment were made in 60 days. The allowance was certainly reasonable, in view of all the circumstances, and was the equivalent of a bulk sale at 4.8 per cent. less than what McManus would himself have received after he had succeeded in selling all the goods by separate contracts. He complains that the payment was not made in 60 days, but I do not find any proof of this. It does not appear when the under-

writers paid the defendants, but it does appear that McManus was allowed full credit for the sum allowed upon the defendants' books on August 3, 1910, which was 74 days after the fire, and which was equivalent to a cash payment at that time.

The question remains whether Blake had authority to make the settlement, which depends upon the question of fact between McManus, on the one hand, and Blake and Andrews, on the other. I find in favor of the defendants upon this issue. In the first place, McManus' bearing was not impressive. Again, I am satisfied that he destroyed his books. Again, his claims have been shifting, vague, and baseless. Finally, Andrews' memorandum seems to me to remove any doubt about the fact. It is true that McManus' letter of June 6th may be read to imply that the matter had not been left in Blake's hands; but, considering its source, it may well have resulted from a change in his position after he had found that the settlement would not be to his liking.

This completes the exceptions of surcharge, and the plaintiff has failed in each case.

There are two exceptions of falsification: The first is that the defendants have credited themselves with compound interest on their advances; the second, that they have credited themselves with a 4 per cent. commission on effecting the settlement with the underwriters.

[8] Respecting the exceptions of interest, the facts are as follows: The accounts were figured monthly and each side of the account was charged with interest. The balance was then carried forward to begin the next account, and necessarily in that balance was included the balance of interest found due in the last account. As interest was figured upon that balance, the result unquestionably was to allow interest upon interest. This had been the uniform course of the parties throughout their two years of dealings, and at no time did McManus raise any question about it. Compound interest is not illegal, and the parties may agree upon it if they wish. Allen-West Commission Co. v. Patillo, 90 Fed. 628, 33 C. C. A. 194. The question is whether the parties had agreed upon this method of keeping their accounts. As the plaintiff returned each of the "accounts current" sent after the fire, no estoppel can arise from them; but he did not adopt this practice before that time. From March, 1908, the parties had been in business together, and throughout all the time the "accounts current" had been regularly sent, and there is no suggestion that they had been returned. On the contrary, the whole business had been done upon their basis without any complaint by the plaintiff. This established the course of the business by mutual consent upon a footing which was entirely reasonable in itself. The credit is therefore allowed.

The second exception of falsification is of the credit of a 4 per cent. commission upon effecting the adjustment. This depends wholly upon the testimony of Blake, in which he is contradicted by McManus. Upon the authority to settle with the underwriters Blake is corroborated by Andrews' memorandum; not so as to the promise to allow commissions. Blake says that McManus came in on the morning after the fire, April 21st, and that Blake at that time said that he would under-

take the adjustment if he was allowed his commissions, to which Mc-Manus assented.   In McManus' letter of June 18, 1910, he speaks of allowing the commission, but not allowing any more than 7 per cent. discount.   He is, however, not referring to any talk, but to the contract of March 31, 1908, which certainly did not govern the case of an insurance adjustment.   That the defendants should, however, have been allowed something for adjusting the loss, was a very natural thing; they had an immense deal of clerical labor to perform, and Blake's work counted for something.   The fact that McManus contradicts Blake counts for nothing, in my judgment; the only question is whether Blake's memory is to be trusted, in view of his interest.   I see no sufficient reason to doubt his story, and I find that the credit has been proved.

[9] Thus the exceptions to the account, either of surcharge or falsification, are all overruled.   Now an account, when duly presented under the oath of the accounting party, will be passed by the court save in those respects in which the other party excepts to it.   Moreover, it is a well-established rule that a party who demands an accounting ,submits himself to the result of the account if it goes against him.   No cross-bill is necessary, and a decree may go for the balance either way. Wilcoxon v. Wilcoxon, 199 Ill. 244, 250, 65 N. E. 229.   It follows that the defendants may take their decree for $808.94 against the plaintiff, which is the balance due on the account.

In this view no consideration of the counterclaims is necessary. However, they must be dismissed, since they rest upon an account stated, and none such was proved.   This, however, will not take from the. defendants their costs.