## ARKANSAS NATURAL GAS CORPORATION et al. v. PIERSON et al.

### No. 10431.

Circuit Court of Appeals, Eighth Circuit.
July 9, 1936.

Jesse Reynolds, of Clarksville, Ark. (H. C. Walker, Jr., of Shreveport, La., on the brief), for appellants.

G. O. Patterson, of Clarksville, Ark. (G. O. Patterson, Jr., of Clarksville, Ark., on the brief), for appellees.

Before GARDNER, SANBORN, and BOOTH, Circuit Judges.

SANBORN, Circuit Judge.

Briefly stated, the facts out of which this controversy arises are these:

The Piersons, appellees (plaintiffs), own 120 acres in Johnson county, Ark., described as the northeast quarter of the northeast quarter of section 22, and the west half of the northwest quarter of section 23, township 10 north, range 24 west. On May 19, 1928, they included this land in an oil and gas lease to the Arkansas Natural Gas Corporation. The lease was for five years and as long thereafter as oil or gas was produced from the leased land. There were other lessors, and other lands were included in the lease, but with them we are not concerned. The consideration for the lease was the payment of $2,000 and a one-eighth royalty interest in all gas and oil produced. The lease was assigned by the lessee to Bethany Oil & Gas Company, without the lessors' consent. Subsequently that company became the Arkansas Louisiana Gas Company. (The appellants will be referred to as "the lessees.") At the time the lease was made, there was a well on the northeast quarter of the northeast quarter of section 22 which had been

put down in 1921 by the Indiahoma Oil & Gas Company. It was 2,345 feet deep and came in with an initial production of 6,-500,000 cubic feet of gas per day. About a year later, its production was down to 3,-000,000 cubic feet per day. It was never commercialized, and no use was made of the gas except by the Piersons in their home and by the Indiahoma Oil & Gas Company in drilling other wells on other property. In 1928 the well was not producing, and had been drowned out by salt water which had come into the well either from the gas sands or from some vein above the sands, the source of the water being in dispute. Shortly after the lease in suit was made, the Arkansas Natural Gas Corporation plugged the well, without having made any attempt to restore it. In November, 1928, the lessees completed a well on property owned or controlled by them 626 feet north of the northeast quarter of the northeast quarter of section 22, known as the Houston well. It was 2,440 feet deep, and its initial production was 1,-500,000 cubic feet of gas per day. In December, 1930, the lessees completed another well 852 feet north of the northwest quarter of the northwest quarter of section 23. This well was 3,155 feet deep, and its initial production was 21,000,000 cubic feet of gas per day. It was called the Hudson-Kelley well. Both of these wells went into commercial production.

The lease contained the following provision relative to the development of the leasehold: "If no well be commenced on said land on or before the 19th day of May, 1928 [1929], this lease shall terminate as to both parties, unless the lessee, on or before that date shall pay or tender to the lessor, or to the lessor's credit in the First National Bank of Clarksville, Arkansas, or its successors, which shall continue as the depository regardless of chances [changes] in the ownership of said land, the sum of One Hundred and no/100 Dollars which shall operate as a rental and cover the privilege of deferring the commencement of a well for 12 months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods in the same number of months successively."

The lessees never developed the Pierson land for oil or gas. After the lease had been in force for a year, the lessees paid $100 to the Piersons, which extended the privilege of drilling to May 19, 1930.

Thereafter the Piersons refused to accept further payments tendered them for the purpose of extending the drilling privilege beyond May 19, 1930, and demanded that the lessees protect the leased lands from drainage by drilling off-set wells. Thereupon the lessees, without the knowledge or consent of the Piersons, filed a deed of release of their two forties nearest the Houston and Hudson-Kelley wells. This deed was recorded August 25, 1930. On April 7, 1932, the lessees filed another deed of release of all lands included in the lease. This also was done without the Piersons' knowledge or consent.

The Piersons, in August, 1930, brought suit in equity in the chancery court of Johnson county, Ark., to enforce specific performance of the lease, to recover damages for drainage of gas from their lands, and to enjoin future drainage. The suit was removed to the United States District Court for the Western District of Arkansas by the appellants. The case came on for trial, and the court dismissed the lessors' complaint as to all issues except that of drainage, as to which issue the court reserved its decision and granted an opportunity for the production of further evidence. Upon the trial of the issue reserved, the court found that there are two productive sands in the Clarksville gas field in which the Pierson land is located; that both sands underlie the Pierson land; that it would be profitable to the Piersons and to the lessees to develop and protect, by drilling, the northeast quarter of the northeast quarter of section 22, and the northwest quarter of the northwest quarter of section 23; and that that particular part of the leased land has been drained of gas by the Houston and Hudson-Kelley wells to the extent of 30 per cent. of the production of those wells. The court also held that there was an implied covenant in the lease to protect the lands of the Piersons from drainage by wells drilled by the lessees upon their adjoining property, and that the failure of the lessees to protect the Pierson land from such drainage constituted a breach of this implied covenant and entitled the Piersons to damages. The damages allowed were in an amount equal to the value of one-eighth of 30 per cent. of the gas produced from the Houston and Hudson-Kelley wells during the period from May 19, 1930, to December 1, 1933. The agreed value of the gas was 8 cents per thousand cubic feet. A decree in

favor of the Piersons for $2,679.63 was accordingly entered, and from this decree the lessees have appealed.

The lessees, as a basis for the reversal of the decree, assert:

1. That the evidence ·is insufficient to justify a finding that the Pierson land was drained by either the Houston or the Hudson-Kelley wells.

2. That the lease contained no implied covenant to drill the Piersons' land, and that there was an express stipulation in the lease against implied covenants.

3. That the lease was canceled in 1930.

We shall consider these contentions in their order.

1. The lessees argue that the sand which produced the gas in the Piersons' well in 1921 and succeeding years and the sand from which the Houston well produced gas are not the same sand, and that the Piersons' well was drowned out by water from gas sand at the bottom of the well. It is their contention that further drilling of the Pierson land would be impractical. With respect to the Hudson-Kelley well, the lessees' contention is that the so-called Kelley sand which produces the gas from that well is several hundred feet below the producing sand of the Houston well, and that the Kelley sand underlying the Pierson land is lower on the structure and is inundated by salt water, and that there could, therefore, be no drainage of gas from the Pierson land through the Hudson-Kelley well. With respect to the Houston well, the lessees' experts expressed the opinion that the producing sand is not the same sand as that of the Pierson well which had been plugged; that the producing sand in the Pierson well was a "sand-lens" or isolated gas sand which did not extend to the Houston well; that the Pierson well was drowned out by water from the gas sands at the bottom of the well; and that the Houston well was not draining gas from the Pierson land. The Piersons' experts, on the other hand, gave it as their opinion that the producing sands of the Houston and Pierson wells are the same, and that the Pierson sands are being drained by the Houston well. One of the Piersons' experts, a consulting geologist, gave it as his opinion that the water in the Pierson well was not water from the gas sand, but was seepage water from above the gas sand. There was also expert testimony to the effect that the only sands which produced salt water in that gas field were far above or far below the producing sand of the Pierson well. With respect to the Hudson-Kelley well, the lessees' experts were of the opinion that any well drilled to the Kelley sands on the Pierson land would be a salt water well, since the Pierson land was somewhat lower on structure, and that there could be, therefore, no drainage of the Pierson land by the Kelley well. The Piersons' experts opposed this view, being of the opinion that the Kelley sands under the Pierson land would be productive of gas and were being drained by the Hudson-Kelley well. One of the geologists who testified for the Piersons estimated the drainage of the Pierson land by the Houston and Hudson-Kelley wells to be as much as 40 per cent. of the production of those wells, for the reason that the gas would drain more readily up-structure. Another geologist of wide experience estimated the drainage by the Houston well to be approximately 30 per cent. of its volume from the nearest Pierson forty (the northeast quarter of the northeast quarter of section 22), and 15 per cent. from the other forty (the northwest quarter of the northwest quarter of section 23).

The findings of the court below were obviously based upon testimony much of which was in direct conflict.

■ "It is a well-settled rule governing appellate courts that the findings of fact by a chancellor, although not conclusive upon appeal in equity, are presumptively correct and persuasive. Unless an error has occurred in the application of the law, or a serious mistake has been made in the application of the evidence, or the finding is clearly against the weight of the evidence, such findings will not be disturbed. And this rule is especially. applicable when the evidence was heard orally by the chancellor, and he thus had the opportunity to see the witnesses, observe their demeanor while testifying, judge of their candor and intelligence, and thus be able to determine their credibility and the weight to be given to their testimony." United States v. Grass Creek Oil & Gas Co. et al. (C.C.A. 8) 236 F. 481, 484; Manhattan Life Ins. Co. of New York v. Wright (C.C.A.8) 126 F. 82, 88; State of Iowa v. Carr et al. (C. C.A.8) 191 F. 257, 263; Harper v. Taylor (C.C.A.8) 193 F. 944, 946; DeLaval Separator Co. v. Iowa Dairy Separator Co. (C.C.A.8) 194 F. 423, 425; Arctic Lumber Co. v. Borden et al. (C.C.A.8) 211 F. 50,

52; Larson v. Crowther (C.C.A.8) 26 F. (2d) 780, 787; Johnson v. Umsted et al. (C.C.A.8) 64 F.(2d) 316, 318; Klaber et al. v. Lakenan et al. (C.C.A.8) 64 F.(2d) 86, 89; Norwich Union Indemnity Co. v. Simonds (C.C.A.8) 65 F.(2d) 134; Moss v. Equitable Life Ins. Co. of Iowa (C.C.A.8) 71 F.(2d) 795, 797; Columbia Pictures Corporation v. Lawton-Byrne-Bruner Ins. Agency Co. et al. (C.C.A.8) 73 F.(2d) 18, 20; Borden's Farm Products Co., Inc. v. Ten Eyck et al., 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed. 669.

■ The question whether the lessees' wells were draining gas from the Pierson land was obviously a question for experts. The court below saw these experts and heard them testify, and was therefore in a better position than we are to judge of their credibility, the extent to which their testimony may have been colored by their relations to the parties, and the weight which should be accorded to their opinions. It would be impossible for us to say that the court's conclusion as to drainage, based upon this conflicting expert evidence, was the result of an obvious error of law or a mistake of fact. Hence his findings should not be disturbed in this regard.

■ 2. The lessees say that they were under no obligation to develop the Pierson land, because the lease contained no implied covenant to develop it, but, on the contrary, contained an express stipulation against implied covenants.

The following authorities clearly indicate that, unless the lease contained a stipulation to the contrary, there was an implied covenant to drill the land:

Blair v. Clear Creek Oil & Gas Company, 148 Ark. 301, at page 308, 230 S.W. 286, 288, 19 A.L.R. 430, in which it was said: "It is a matter of common knowledge that the landowner is not equipped with machinery for drilling and could not purchase such machinery on short notice, if able to do so. Hence, when he leases his land to another with the exclusive right to drill for oil and gas on it for a stipulated period of time, there is an implied covenant on the part of the lessee to protect the land at least from wells drilled by him on adjoining property which will necessarily draw the gas from the lessor's land."

Brewster v. Lanyon Zinc Co. (C.C.A.8) 140 F. 801, at page 814, in which this court said:

"By reason of the conditions on which the lease is granted the lessor retains at least a contingent interest in the oil and gas, to the profitable extraction of which the operations are directed. This interest in the subject of the lease, and the fact that the substantial consideration for the grant lies in the provisions for the payment of royalties in kind and in money on the oil and gas extracted, make the extent to which and the diligence with which the operations are prosecuted of immediate concern to the lessor. If they do not proceed with reasonable diligence, and by reason thereof the oil and gas are diminished or exhausted through the operation of wells on adjoining lands, the lessor loses, not only royalties to which he would otherwise be entitled, but also his contingent interest in the oil and gas which thus passes into the control of others. The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. * * *

"But, while this is so, no breach can occur save where the absence of such diligence is both certain and substantial in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of mining enthusiasts. The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required. Whether or not in any particular instance such diligence is exercised depends upon a variety of circumstances, such as the quantity of oil and gas capable of being produced from the premises, as indicated by prior exploration and development, the local market or demand therefor or the means of transporting them to market, the extent and results of the operations, if any, on adjacent lands, the character of the natural reser-

voir—whether such as to permit the drainage of a large area by each well—and the usages of the business. Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

See, also, Standard Oil Co. of Louisiana v. Giller et al., 183 Ark. 776, 38 S.W. (2d) 766; Orr v. Comar Oil Co. (C.C.A. 10) 46 F.(2d) 59; Clear Creek Oil & Gas Co. v. Brunk, 160 Ark. 574, 255 S.W. 7; Mansfield Gas Co. v. Alexander, 97 Ark. 167, 133 S.W. 837; Ezzell et al. v. Oil Associates Inc., 180 Ark. 802, 22 S.W.(2d) 1015, 1018; Lawrence Oil Corporation v. Metcalfe, 241 Ky. 353, 43 S.W.(2d) 986, 989; Central Kentucky Natural Gas Co. v. Williams et al., 249 Ky. 242, 60 S.W.(2d) 580, 583, 584.

■ But the lessees assert that the following language found in the lease constitutes a stipulation against implied covenants: "And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred."

If it was the intention of the parties, by using this language, to stipulate against implied covenants, they failed to express in words what they had in mind. We think that it is obvious that, without reformation, no such effect could be given to this provision as is contended for by the lessees.

3. The lessees say that the lease was canceled in 1930 by the Piersons' refusal to accept the rental for the following year, as well as by the deed of release filed August 25, 1930, whereby the lessees attempted to release the two forty-acre tracts which the court has found were affected by drainage. To sustain their contentions in this regard, the lessees rely mainly on Carson et al. v. Ozark Natural Gas Co. et al., 191 Ark. 167, 83 S.W.(2d) 833, decided in 1935, in which the Supreme Court of Arkansas held the lessor entitled to recover damages for drainage of a tract by surrounding wells, even though a release was filed by the lessee. The court in that case based its decision upon the fact that the lessee had failed to surrender the premises because it maintained a pipe line across them. The court did, however, in its discussion, state that the lessee had the right to cancel the lease or that the lease cancelled itself when the lessee failed to drill or pay the delayed rental and surrendered the property. The provisions of the lease there involved with respect to its termination on default by the lessee were similar to the provisions of the lease in suit. The Supreme Court of Arkansas cites no authority for the proposition that failure to drill caused such a lease to cancel itself, and it is so evident that the statement was made without adequate consideration and was dictum that it would be impossible for us to hold that it was the settled rule in Arkansas, particularly in view of the fact that the great weight of authority is to the contrary.

■ The rule is that leases of the type here involved become voidable at the option of the lessor upon failure of the lessee to comply with his covenants. It is stated in 18 R.C.L. 1215, § 115, as follows: "Provisions for forfeiture are for the benefit of the lessor and it has frequently been held that the lessee will not be permitted to plead his own default or wrong in discharge of his obligation to drill or pay rental. His default merely gives the lessor an option to declare the lease void for that reason, and does not relieve the lessee from liability. Though such a covenant is for the benefit of the lessor, it is not self-operating so as to make the occurrence of the breach work a forfeiture of the lease, ipso facto, since the lessor may, notwithstanding the breach, choose to enforce the contract; and this is true, though the lease provides that it shall become null and void upon the failure of the lessee to perform the covenant." See, also, Thornton's Law of Oil and Gas, § 175; Ogden v. Hatry et al. 145 Pa. 640, 23 A. 334; Woodland Oil Co. v. Crawford, 55 Ohio St. 161, 44 N.E. 1093, 34 L.R.A. 62; Perry et al. v. Acme Oil Co., 44 Ind.App. 207, 88 N.E. 859, 861; Hancock et al. v. Diamond Plate Glass Co. et al., 162 Ind. 146, 70 N.E. 149; New Domain Oil & Gas Co. v. Gaffney Oil Co., 134 Ky. 792, 121 S.W. 699, 702; 40 C. J. 1077, § 695.

■ The Piersons' refusal to accept further payments for the deferring of the privilege to drill their land, in view of their insistence that the lessees had breached their obligation to develop it, would not have the effect of canceling the lease. In fact, they could hardly accept the consideration for extending the privilege to drill and insist that the lessees were in default for failing to drill.

■ Since the court below found, upon sufficient evidence, that it would be profitable to the Piersons and to the lessees to have developed and protected the Pierson land, and that the lands were being drained of gas by the Houston and Hudson-Kelley wells, it seems clear that the Piersons were entitled to damages. The court below, however, in assessing damages, assumed that, by virtue of the clause of the lease providing that it should continue for a five-year period and "as long thereafter as oil or gas, or either of them is produced from said land by the lessee," the lease had been extended beyond the five years by reason of drainage of gas by the lessees' wells. Our opinion is that the lease, with all covenants, express and implied, terminated May 19, 1933, at the end of the five-year period, and that the Piersons were not entitled to damages for drainage occurring thereafter. The words "produced from said land by the lessee," if given a reasonable construction, we think relate to gas produced by reason of the development of the leasehold under the lease. Hence we reach the conclusion that in assessing damages the court erred in including damages for drainage which occurred after May 19, 1933.

The decree appealed from, for that reason alone, must be reversed in so far as it includes damages for drainage occurring after May 19, 1933. In so far as it includes damages for drainage up to that time, it is affirmed. The case is remanded, and the lower court is directed to correct the decree in accordance with this opinion.

It is so ordered.