## DITTO v. DUFUR et al.
### No. 10623.

Circuit Court of Appeals, Eighth Circuit.
Feb. 15, 1937.

E. F. McEniry and J. D. Reynolds, both of Creston, Iowa, for appellant.

M. G. Kellam, of Greenfield, Iowa (Frank B. Wilson, of Greenfield, Iowa, on the brief), for appellees.

Before STONE, SANBORN, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

Defendant Dufur in 1922, and for some time prior thereto, owned a three-fourths interest in a private bank known as the Citizens Bank at Lorimor, Iowa. In 1922 the First National Bank of Lorimor was chartered and took over certain assets of the private bank, amounting, approximately, to $227,000. The new national bank was operated in the same building in which its predecessor had been located. This building was owned by Dufur, who occupied as an office, and conducted private business in, a room adjacent to that in which the business of the bank was conducted. He was president and director of the bank, and assisted in the transaction of some of its business, but the cashier, Murray G. Bacon, was its managing officer. Dufur's participation in the business of the bank consisted largely in being consulted by the cashier with respect to the extension of any large line of credit to borrowers. He also, as the cashier testifies, "received some deposits, some in the back room,

and some at the windows. He made loans to customers and sometimes wrote out the note or called an employee or myself." Mrs. Bacon, wife of the cashier, and employed as bookkeeper, testifies that Dufur had an office in the back room of the bank. "He had free access to the vault, and the books of the bank, and I never noticed in particular him examining books and loans and other things there in the bank, back of the counter and back of the desk." The general administration and conduct of the business was lodged in the cashier. Dufur had approximately $70,000 on deposit in the bank. He was about 82 years of age at the time of the transactions involved in this litigation, and 85 years old when this case was tried. Since the taking of this appeal this court has entered an order making True Woods, the permanent guardian of the person and property of Dufur, a party appellee in this cause.

March 4, 1933, the bank, being insolvent, was so declared by its board of directors. The Comptroller of the Currency immediately took charge of its affairs. Appellant Ditto is now its duly appointed, qualified and acting receiver. February 1, 1935, the then receiver of the bank filed suit against Dufur in 21 counts by which he sought to recover the aggregate sum of $33,981.37, alleging that the defendant, in collusion with cashier Bacon, and in violation of the National Banking Act of the United States had caused losses to the bank in that amount. Subsequently the various counts of the petition were amended and the following is typical of the amended causes of action stated: "For Amendment to Count 1 of Plaintiff's petition, the Plaintiff withdraws the following words: 'and in violation of the National Banking Act of the United States of America as amended,' and alleges that prior to January 10th, 1933, the said First National Bank, Lorimor, Iowa, had suffered large losses by reason of poor loans, a more particular description of which loans is now unknown to Plaintiff; and that the Defendant, in collusion with the said M. G. Bacon as alleged in Count 1, received the said deposit of R. J. Hammans, as Secretary of the Monroe Township School District, and used the same to pay, cancel and balance a part of the losses theretofore suffered by the Bank as aforesaid, in the sum of $688.90, and failed to give credit to the said Monroe Township School District, thereby causing the loss to the First National Bank, Lorimor, Iowa, in the sum of $688.90 as alleged in Count 1 of Plaintiff's petition."

In his answer defendant Dufur denies categorically the charges made in the several counts of the petition, and then added a count, No. 23—in which he recited his deposit amounting to $70,916.22 which had been allowed to him by the receiver, on which one dividend had been paid and a second declared; also the recovery by the receiver of $5,000 against a surety company on the bond of Cashier Bacon, for the identical items upon which this suit had been brought. Defendant, in case anything should be found against him in this action, asked an offset of his said claims, and all that might be found due him in winding up the affairs of the bank.

The acts complained of in the several counts of the petition, whereby the alleged losses resulted, were those of the cashier, Bacon. It appears that the First National Bank had suffered losses by reason of poor loans. This is the specific charge of the receiver. To repair these losses, so far as shown by the books and records of the bank, the cashier committed irregularities principally of two kinds. He received deposits of cash without crediting the depositors upon the books, and he sold bonds belonging to the bank, or to others who had left them in the custody of the bank, without giving proper credit on the books of the bank. The cash thus realized went into the bank's current funds, and was used in the ordinary course of its business. There is neither allegation nor proof that it found its way into the pockets of the president or cashier. The charge against Dufur is that, in collusion with Bacon, he received the deposits specified, and the proceeds of the bonds, and "used the same to pay, cancel, and balance a part of the losses theretofore suffered by the bank as aforesaid." The only testimony that is conceived to support these allegations as to appellee Dufur is that of cashier Bacon. He, of course, concedes his irregularities in the respects charged, and says they were committed to keep the bank in essential funds and as a going concern. He says:

"After these losses developed in the bank I talked to Mr. Dufur about them.

"Q. What did he say? A. Well generally he would expect me to look after it in some way and take care of it. I don't recall just what he said. * * * He kept insisting that it was my duty to get them (the losses) cleaned up and promised me a number of times that if it was necessary for him to put up money personally, that he would do it to help the bank out."

The cashier kept a memorandum of all these irregular transactions in an envelope in his desk, so that the proper disposition of the items could be made when necessity required. He says further: "This envelope was on or in my desk. I talked to Mr. Dufur a good many times about our losses and about irregularities, and I never could get him to see through, and by irregularities I mean these cash items in the way they were carried; these items I was carrying off the books and in this envelope and other places in the bank that were not shown by the books were irregular banking."

It will be observed that Bacon does not say that he disclosed the nature of the irregularities to Dufur. The contrary appears from his further testimony in the same connection:

"I would say I talked to him a number of times about it being handled in an irregular manner. I don't think I told him in just what way. I don't recall that I did. * * *

"In my conversations with Mr. Dufur about these losses I couldn't get it into his head the seriousness of the situation, and I would come to the conclusion finally that I didn't know whether he really knew how serious it was. I don't know just how far I went in telling how I was keeping these losses. * * *

"I couldn't say that I talked to Mr. Dufur about the use of these bonds, or the proceeds of the bonds for that purpose, because that was in just the last month or two there. No, I don't know as there was a conversation between me and Mr. Dufur with regard to the sale of these bonds and the use of the proceeds in that way. All I talked to him about was these losses, that they would have to be taken care of some way, and I told him some of them were carried in an irregular manner. * * *

"Mr. Dufur did not receive any of these deposits or make any one of these deposit slips out in any one of these cash items which have been mentioned here and which are set out in plaintiff's petition. I don't know just who made all the deposit slips but I was the one that handled the items. I think these were made in my handwriting. In other words, Mr. Dufur had nothing to do with the deposits or sale of these bonds in any one of the cases."

None of the other witnesses testified to having contact with Dufur in connection with these irregularities charged. The testimony contains no support for the charge that Bacon acted in collusion with Dufur nor at his direction. The latter received none of the proceeds realized from the transactions. He says:

"Prior to March 4th, 1933, I did not know anything about the irregular deposits that have been testified about, nor did Mr. Bacon ever tell me that he was holding off any deposits from the books of the Bank, nor did anyone else. * * *

"I never entered into any agreement with Mr. Bacon to withhold deposits as has been shown in this case. I would have sure stopped it. I would not have been in favor of it. I did not enter into collusion with Bacon to damage the bank or cause losses or misapply any funds."

In the petition there is no allegation of liability on the basis of negligence on the part of officers and directors in failing to ascertain and prevent the irregular acts of Bacon.

After the filing of defendant's answer the receiver moved to transfer the cause to the equity docket upon the ground that such action would avoid a multiplicity of suits, and would expedite a speedy determination of the issues, and on the further ground "that count twenty-three of defendant's answer and the reply thereto, present matters of purely equitable cognizance which should be tried by this court sitting as a court of equity." This motion was sustained, and the case was tried in equity in accordance therewith. The court found the issues for the defendant, decreed that the petition be dismissed upon its merits with costs taxed against the plaintiff, and found among other things that, by the false statements and irregularities on the part of Cashier Bacon, the bank sustained losses as charged in the various counts of the petition; but that none of said false statements or

irregularities were made by the defendant Dufur, who was then advanced in years, and that there was a considerable question of his appreciation of the effect on the bank of these false entries or lack of entries if he was informed or knew of them; and further "that the defendant did not authorize or request the cashier to falsify the records, and the evidence did not sustain the allegations of plaintiff's petition that he was in collusion with the cashier in so falsifying the records, as claimed in the petition and amendments thereto." Accordingly the court, as a conclusion of law, found that "the evidence does not sustain a judgment or finding and the entry of judgment against this defendant for any amount, as there is no evidence establishing collusion on his part, or a joint tort with Murray G. Bacon."

■ Upon the record in this case we think the rule quoted by this court in Arkansas Natural Gas Corporation v. Pierson, 84 F.(2d) 468, 470, is applicable: "It is a well-settled rule governing appellate courts that the findings of fact by a chancellor, although not conclusive upon appeal in equity, are presumptively correct and persuasive. Unless an error has occurred in the application of the law, or a serious mistake has been made in the application of the evidence, or the finding is clearly against the weight of the evidence, such findings will not be disturbed. And this rule is especially applicable when the evidence was heard orally by the chancellor, and he thus had the opportunity to see the witnesses, observe their demeanor while testifying, judge of their candor and intelligence, and thus be able to determine their credibility and the weight to be given to their testimony."

■■ The evidence was heard orally by the trial court. Whether there was collusion between Dufur and Bacon was a plain question of fact, upon which that court was in the best position to determine the weight to be given to the testimony of witnesses. It is further our opinion that the testimony of Bacon falls far short of sustaining the charge of collusion. The question of whether, under the pleadings and evidence, the bank did actually sustain any loss by reason of the irregularities shown to have been committed by cashier Bacon may be somewhat doubtful. There is neither claim nor evidence that either Dufur or Bacon abstracted any money or assets from the bank. However, we deem the determination of that question unnecessary to the disposal of this appeal, and are content to leave it as found by the chancellor.

■ After the cause, upon appellant's motion, had been transferred to the equity docket, the prayer of his petition was amended to include the following words: "The plaintiff prays that the court grant plaintiff such other and further relief as to equity and good conscience may pertain." Upon this language counsel now seeks recovery against Dufur because of negligence as president and director in failing to exercise proper supervision and control over the operations of the bank. As already stated, the petition contains no allegation of such a ground of recovery, but is bottomed upon the explicit charge of collusion and participation in the irregularities pleaded. In each count of the amended petition appellant expressly withdrew the charge that the acts complained of were done in "violation of the National Banking Act of the United States of America as amended." The petition might, perhaps, have been framed upon the theory of a breach by defendant Dufur, as officer and director of the bank, of his statutory, as well as his common-law, duty in this regard. Bowerman v. Hamner, 250 U.S. 504, 39 S.Ct. 549, 63 L.Ed. 1113. But it was not so framed. The facts concerning a cause of action must be distinctly alleged and must be consistent with the relief sought. No act pleaded in this petition sounds in negligence. The relief granted under a prayer for general relief must be agreeable to the case made by the bill. Bowerman v. Hamner, supra. As said by counsel for appellees: "Negligence in the particulars charged in the petition, if shown, is inconsistent with the allegations of the respective causes of action. An intentional and collusive act contains none of the elements of negligence. On the contrary, negligence is necessarily excluded."

We agree that such a conflict between the relief, now sought, and the cause of action stated cannot be removed by a prayer for general equitable relief.

270

We see no reason for disturbing the findings and conclusions of the chancellor, which find ample support in the record, and the decree accordingly is affirmed.