## COLVIN v. SWEET et al.
### No. 1688.

Circuit Court of Appeals, Tenth Circuit.

Dec. 7, 1938.

T. Austin Gavin, of Tulsa, Okl., for appellant.

C. A. Steele and W. A. Daugherty, both of Tulsa, Okl., for appellees.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

On the 23d day of December, 1922, J. E. Crosbie, one of the appellees in this action, and the Bradstreet Oil Company, acting through its president, L. G. Bradstreet, entered into an agreement respecting certain oil properties in Ouachita County, Arkansas, jointly owned. It was provided that, in order to secure Crosbie for the monies which he had paid out in their development, and would necessarily pay out to further develop said properties, the undivided one-half interest which the Bradstreet Oil Company owned in these various oil and gas leases, tank farms and contracts, would thereby be assigned to said Crosbie, it being stipulated that when these properties were paid out and Crosbie had been repaid for the advances he had made or would make to the joint account for the development of said properties, he would re-assign to the Bradstreet Oil Company or its successors in interest, the aforesaid one-half interest which under the terms of the contract the Bradstreet Oil Company was assigning to him.

Thereafter the aforesaid properties were exclusively operated and controlled by said Crosbie, great quantities of oil taken therefrom and a portion of the personalty thereon having been sold by Crosbie. In 1925, the Bradstreet Oil Company went into bankruptcy, H. C. Colvin, appellant herein, being appointed as trustee. Said trustee then made a demand in writing upon said Crosbie for an accounting with respect to the said contract. No response being received, subsequently, on January 5, 1934, application was made to the United States District Court for the Northern District of Oklahoma for an order to allow him to employ counsel and institute suit.

Such order was made on January 5, 1934. This action was filed March 31, 1934, appellant's bill of complaint setting forth two causes of action: (1) For an accounting under the contract, and (2) that the assignment be held to be a mortgage and, in the event that on an accounting it was shown that the properties had paid out, that the court should decree that the contract be canceled and the said property be reconveyed.

Attached to the complaint as Exhibits A and B were copies of the contract and letter requesting an accounting.

The appellees herein (co-executrices) filed an answer to said bill, in which they, in substance, admitted the contract, and

that it was in effect a mortgage but denied that the properties had paid out. It was also specifically alleged in said answer that appellant had had complete access to the books of said Crosbie and further that in response to an order of the referee in bankruptcy they had filed a full account of the operations of said properties, attaching thereto as exhibits the following:

A. Account filed by appellees in response to order of bankruptcy court.

B. Copy of contract for sale of oil to American Petroleum Company, entered into by J. E. Crosbie and the Bradstreet Oil Company, by L. G. Bradstreet, its president, on December 18, 1922.

C. Account of operations of the said properties during the year 1933 alleged to have been furnished the appellant.

D. Account of operations for January 1, 1934, to April 1, 1934.

In response to defendant's answer there was filed a motion for a further and better statement and to strike out certain parts of defendant's answer and exhibits, in which the complainant asked for more information concerning several items of the accounts as given in defendants' exhibits and asked that certain irrelevant material contained in the answer be stricken. The court after a hearing ordered that irrelevant material be stricken, but overruled the requests for additional information, to which ruling the defendants excepted.

In this hearing it developed that the defendants, J. E. Crosbie and Little Fay Oil Company, a Crosbie property, were willing that an audit be made of the account provided the complainant, trustee for Bradstreet Oil Company, bore the expense. This offer was accepted and the court appointed J. J. O'Brien as an auditor and accountant "to examine the books and records of the defendants, and to report that same into court within sixty days."

To aid the inquiry thus entered into there was filed an application for an order permitting an inventory of the personal property on the leases in question in Arkansas, which was made on condition that L. G. Bradstreet should bear the necessary expenses.

An audit of the accounts and inventory of personal property was made and on June 14, 1937, the matter came before the court for a hearing. Testimony was there introduced on behalf of complainant, and at the conclusion thereof the defendants demurred to the evidence. The court thereupon

gave the trustee in bankruptcy and creditors of the Bradstreet Oil Company until June 21, 1937, to decide whether they would advance funds for the cost of an accounting by a master.

When it appeared on June 14, 1937, that said trustee or creditors of the Bradstreet Oil Company were either financially unable to advance the necessary funds to pay for the expense of a master, or did not desire to do so, the court entered judgment for the defendant and against the plaintiff. Plaintiff excepted to the court's decree and by leave of court prosecuted an appeal therefrom.

J. E. Crosbie, Inc., and the Little Fay Oil Company are successors in interest to J. E. Crosbie. They are both owned almost entirely by said J. E. Crosbie, and took the properties with notice of all the facts, and will be treated as one and the same as J. E. Crosbie.

Pursuant to an order of the referee in bankruptcy, in Re Bradstreet Oil Company, Bankrupt, No. 30, the appellees filed a complete statement of the account of the handling of properties involved in this action, being filed almost a year before this action was brought, a copy being attached to appellees' answer and verified by their auditor.

The court made an order on the 10th day of July, 1934, appointing J. J. O'Brien, auditor and accountant, to examine the books and records of the defendants and report same into court within sixty days. Said auditor spent over a year going over the books and records of the appellees. Neither before nor after he made his report did the appellant file any pleading of any kind charging fraud, mistake or maladministration with reference to the verified accounts attached to said answer of the appellees.

Appellant claims that the trial court (1) erred in failing to sustain complainant's motion for the appointment of a master to take and state an account between said complainant and the said J. E. Crosbie, J. E. Crosbie, Inc., and Little Fay Oil Company, (3) erred in rendering judgment in favor of said appellees, (4) erred in failing to render judgment in favor of said complainant and in dismissing said cause, and (5) erred in failing to decree that complainant as the successor in interest of Bradstreet Oil Company, owned and still owns an undivided one-half interest in all of those certain properties covered by that

certain contract sued upon in this case between Bradstreet Oil Company and J. E. Crosbie, dated December 23, 1922, subject to the balance, if any due and owing under the accounting prayed by said complainant.

It is conceded by all parties hereto that "There is no question that the contract entered into * * * was a mortgage of the one-half interest of the Bradstreet Oil Company to secure Crosbie for Bradstreet's half of the sums advanced and to be advanced by him for the purchase, equipment, development and operation of the oil and gas leases covered thereby," and that "a mortgage in possession is required to account for rents and profits."

Appellees concede that the burden rested upon them to prove the correctness of their account, but insist there be sufficient evidence in the record to establish same.

■ (1) On or about January 17, 1938, attention of the solicitor for appellant was called to the fact that a hiatus existed in the enlargements of time theretofore granted, in that the former enlargements of time expired on October 25, 1937, and no further enlargement was obtained until October 29, 1937. Objection was made on or about January 17, 1938, to the trial court granting a further extension of time, for the reason that under the rules of the Tenth Circuit Court of Appeals his authority to grant further extensions or enlargements of time expired when the previous enlargements of time expired, it then being called to the attention of the solicitor for appellant that the proper procedure was for him to apply to the Circuit Court of Appeals for leave to file and docket his appeal out of time.

In American Gas Machine Co. v. Willcuts et al., 8 Cir., 87 F.2d 924, and Witte v. Franklin Fire Insurance Co. of Philadelphia, 8 Cir., 46 F.2d 894, the transcripts were filed within the term in which the appeal was returnable, there being only a few days' delay from the time order enlarging time expired until the appeal was filed.

In Witte v. Franklin Fire Insurance Co. of Philadelphia, supra, quoting from Midland Terminal Railway Co. v. Warinner, 8 Cir., 294 F. 185, it is stated [page 895]:

" 'It has never "spent its force" because the term of this court at which such case should be docketed has not passed.' "

In Gould v. United States, 8 Cir., 205 F. 883, in an opinion by the late Judge Walter H. Sanborn, it is said [page 884]:

"Where under these rules the transcript or return is filed in the appellate court after the return day named in the writ, but before the expiration of the next term after the writ issued, the writ is in force unless before the filing of the transcript or return the defendant in error has moved to dismiss the case. 'It has always been held,' says the Supreme Court, 'that, if the case is not so docketed and dismissed by the appellee, the appellant is in time if the record be filed during the return term.' * * * "

See, also, Pender v. Brown et al., 4 Cir., 120 F. 496.

Under these authorities, this appeal should be dismissed unless good cause for review is shown, and under this record no such showing has been made.

As to the merits it appears that all of Crosbie's books have been made available to the appellant ever since his appointment in May, 1925, as the trustee in bankruptcy of Bradstreet Oil Company, bankrupt. Also, pursuant to an order of the referee in bankruptcy on February 13, 1933, the appellant in March, 1933, was furnished with an account of the receipts and disbursements from these properties up to January 1, 1933, several months before this action was brought. An auditor who was appointed on July 10, 1934, by the court, spent over a year going over Crosbie's books and records, including vouchers and invoices in connection with the various items in the account, and has testified that the account filed by Crosbie agrees with his books and records, with the exception of two mistakes in making up the account, which are admitted, and for which correction has been made in the decree of the trial court.

Appellant complains that in the account filed by Crosbie, it is shown that interest is computed on the yearly balances. Appellees claimed and still claim they are entitled to interest thereon under the contract of December 23, 1922, but if interest is not chargeable the fact that interest is claimed does not affect the correctness of the account, nor of the books and records supporting the account.

The auditor made certain criticisms of the record kept by Crosbie.

The accounts as to the joint leases of Crosbie and Bradstreet Oil Company and Crosbie's individual properties in Arkansas were kept in the same set of books. However, a separate account sheet was maintained which reflected all charges made to the

joint properties; the subsidiary ledger accounts of charges to lease being made up as follows: The lease superintendent in Arkansas would give an order showing what the charges were and to what lease went. The original order went to the seller of equipment, the carbon to Crosbie's Tulsa office, and when the invoice was rendered, it was checked with the carbon copy of the order, the material being charged to the lease to which it went.

The auditor testified that Crosbie's records were prepared by vouchers drawn and distribution made on the invoices attached and entered on the subsidiary ledger sheets.

The method of bookkeeping as detailed by M. E. Church and W. F. Simon, the auditors, prevents confusion as between the charges to the individually owned properties and that of Bradstreet-Crosbie.

Mr. Simon, the auditor appointed by the court, complained that there was no control, it being his idea that when a piece of equipment was purchased, the charge therefor should be made to capital investment, and when the piece of equipment was worn out, capital investment should be credited with the purchase price, and a charge made to profit and loss; and that an inventory showing in detail the equipment on each piece of property at all times should have been kept. Mr. Simon's knowledge of his business and the manner in which he thought the books should have been kept was based on sound accounting principles, perhaps the best method, but Crosbie's books do show clearly, certainly and positively the money that was expended on the jointly owned leases and that which had been received therefrom.

█ It was his idea that it would have been possible for Crosbie to have juggled his books and records so as to defraud Bradstreet. The fact that fraud was possible is not evidence thereof. There is not the slightest evidence that Crosbie's books and records do not show the true state of his account. There is no allegation in the pleadings that the account filed by the appellees in the answer was fraudulent, or that there was any mal-administration of these properties. Appellant did not offer any evidence whatever of fraud or mal-administration, or of conversion of equipment.

Mr. Bradstreet testified:

"This was terribly expensive operation; that he did not intend to suggest that Crosbie did not know how to operate these properties, nor did he mean to imply that the defendant indicated a disposition to take advantage of him."

Ben F. Rounds, who for Bradstreet took a physical inventory of these properties in September, 1935, testified that "he found a considerable charge of material and equipment that wasn't shown on his inventory," and Mr. Simon, the auditor testified:

"In response to a question by the court as to whether any false or bogus items appeared in the statement of account prepared by the defendant, it was the witness' testimony that it looks like the material, as charged by the defendant, was overstated in that it looks like more items were shipped than were used on the leases. The discrepancy seemed to exist chiefly in such articles as tanks, engines, pumps, rigs, boilers, casing, tubing, line-pipe and other equipment and on none of these jointly owned leases does the book value agree with the inventory, which fact shows a lack of proper transfer."

█ It appears, as the trial court took notice, that equipment on oil and gas leases, tanks, engines, boilers, pumps, rigs, casing, tubing, etc., wears out over a period of thirteen years, and that much of it becomes worthless and has to be junked and that it is a matter of common knowledge that in the Smackover Field wooden pumping rigs and derricks, wooden bullwheels and walking beams were used, and that the life of such was short, not exceeding three or four years, and that as to such equipment there was no salvage value whatever, when it wore out or rotted out, and to anyone familiar with the oil business, and particularly the Smackover Field, it was not surprising that slightly more than half of the equipment on these leases had worn out and had been junked after thirteen years of operation. Mr. Rounds, the purchasing agent, and Mr. Simon, the auditor, thought "it looked like" there was too much material charged to these leases. Surmises are not evidence. Mr. L. G. Bradstreet, who knew the Smackover Field from its inception, and was familiar with these leases and the development and operation thereof, up to the time of the bankruptcy of Bradstreet Oil Company in May, 1925, was never questioned by appellant about the amount of equipment purchased or shown to have worn out. Mr. Bradstreet, the one witness produced by appellant who was familiar with the development and operation of these leases, did not question the correct-

ness of the account as to equipment purchased for these leases. He must have known the facts. He had been furnished statements of expenditures on these leases, the last one as of January 1, 1925, which he had never at any time questioned nor criticized.

The record shows that there was an operating profit on these leases, as follows:

"$37,968.74 for 1924; $39,936.35 for 1925; $38,397.41 for 1926; $66,410.89 for 1927; $31,716.84 for 1928; $23,860.66 for 1929; $20,647.72 for 1930; $2,042.05 for 1931; $6,955.88 for 1932; $2,205.37 for 1933."

It seems that the yearly results as shown in the summary of the account filed by Crosbie was stated in red figures, where there was an operating profit, and these red figures showed operating profit during these years. The counsel and Bradstreet evidently assumed to indicate a yearly operating loss, instead of a profit.

In the year 1924 disbursements are shown to have been $119,569.31, and receipts $156,638.05. The yearly result is shown in red as $37,068.74, and the result shown in red was the operating profit for that year, and this is the case as to each intervening year.

As to a large loss on these properties. By the end of 1923 the total investment in this undertaking was $1,350,427.79. Disbursements thereafter for equipment were comparatively small. Up to May, 1925, Bradstreet Oil Company was a going concern. Bradstreet personally was familiar with these operations, being furnished statements from time, the last being up to January 1, 1925, soon after the bankruptcy adjudication. If there had been any question of the investment up to that time as shown by the account, Bradstreet would have raised it.

The contract with the American Petroleum Company on December 18, 1922, which contract is referred to in this joint agreement between Crosbie and Bradstreet Oil Company, caused the greatest single loss in this undertaking, Bradstreet and Crosbie contracting to sell one million barrels of oil at 35¢ per barrel, and two tank farms with fifteen steel storage tanks filled with oil, all for 70¢ per barrel for oil in storage. It became impossible to perform this contract with the oil produced from these properties. The auditor's report was that the net loss on this contract was $313,557.80.

Settlement of a lawsuit with Arkansas Light & Power Company cost $51,449.54, making a total loss on these two items alone of $365,008.34. The $25,000 invested in the Sinclair contract proved to be a total loss. The American Petroleum Company contract was costly not only in the loss of $313,557.80, over seven hundred thousand barrels of oil produced from the Bradstreet-Crosbie leases being applied toward the fulfilling of that obligation, so that the initial large production from these leases, instead of producing a profit, went toward the performance of a contract which resulted in a tremendous loss, and adding to this loss the initial investment in the leases, drilling costs and equipment, and the operating expense, there is a deficit of over $940,000 existing at the end of 1926.

The leases made a profit over operating expenses for 1924 and subsequent years, leaving the total loss to Crosbie, who took all the risk, and has suffered a loss as shown on the account of $788,251.40 up to January 1, 1934. There is nothing in the evidence to show that Crosbie's books were falsely and fraudulently kept, or that he converted materials and equipment purchased for these leases, to his own use on his individual properties. The judgment of the trial court is supported by the weight of the evidence. The appellees' books and records and the testimony of the auditor chosen by the appellant, that the account correctly reflected appellees' books and records, are more than sufficient evidence to the correctness of the account.

In Bell v. Tackett, 134 Okl. 164, 272 P. 461, it is said:

"Where the results of voluminous facts contained in many vouchers, checks, and records are to be proved, and the necessary examination of this documentary evidence cannot be conveniently or satisfactorily made in court, it may, in the discretion of the trial court, be made by an expert accountant or other competent person, and the results thereof may be proved by him, if such instruments are properly in evidence, or their absence satisfactorily explained."

See, also, In the Matter of Walter Peterson, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919; Humphrey v. Bankers Mortgage Co. of Topeka, Kansas, 10 Cir., 79 F.2d 345; Stewart v. American Life Ins. Co., 10 Cir., 89 F.2d 743, and Arkansas Natural Gas Corporation et al. v. Pierson et al., 8 Cir., 84 F.2d 468.

530

The great weight of the evidence shows that no useful purpose would or could have been served by reference to a Master. The trial court had the benefit of an examination of the appellees' books and records by a competent and qualified auditor and accountant. The auditor's testimony is that the account as filed, with the exception of two mistakes, correctly reflects Crosbie's books and records. This is sufficient proof of the account, in the absence of any evidence tending to raise any question of fraud, mistake or maladministration.

There was no question of fact as to Crosbie's books and records required to be presented to a master, inasmuch as they have been checked by an experienced auditor and accountant, there being neither any charge nor any evidence tending to prove that these books and records were falsified or fraudulently kept. It is a matter of discretion with the trial court as to what assistance is needed in settling an account.

See, also, 1 C.J. 644; In the Matter of Walter Peterson, supra; McManus v. Sawyer, D.C.So.Dist.N.Y., 231 F. 231; 1 Am. Jur. 306; Hartman v. Elias, 41 N.M. 392, 69 P.2d 929; 1 C.J. 635; Oskaloosa Savings Bank v. Mahaska County State Bank, 205 Iowa 1351, 219 N.W. 530, 60 A.L.R. 1204.

See, also, annotations at page 1210 of 60 A.L.R., Baker v. Tennent, 108 Wash. 663, 185 P. 576, and Stamps v. Bracy, 2 Miss. 312, 1 How. 312.

The decree of the district court should be affirmed.